# UNITED STATES

v.

**Airman Leslie D. RILEY, FR613–07–1743, United States Air Force.**

## ACM 32183.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 17 Feb. 1996.

Decided 13 Nov. 1997.

Appellate Counsel for Appellant: Mr. Robert E. Watson (argued), Colonel David W. Madsen, Lieutenant Colonel Kim L. Sheffield, and Captain Harold M. Vaught.

Appellate Counsel for the United States: Captain Steven D. Dubriske (argued), Lieutenant Colonel Michael J. Breslin, and Major LeEllen Coacher.

Before PEARSON, MORGAN, and SPISAK, Appellate Military Judges.

OPINION OF THE COURT

PEARSON, Senior Judge:

On July 3, 1995, Airman Leslie D. Riley gave birth to a baby girl in the restroom at

the Dyess Air Force Base (AFB) Emergency Room (ER). That same day, a custodial worker found the baby dead in a trash can while cleaning the restroom. After a litigated trial, court members convicted Airman Riley of murdering her newborn daughter and sentenced her to a dishonorable discharge, 25 years confinement, forfeiture of all pay and allowances, and reduction to E–1. On appeal, she argues that the evidence is factually insufficient to prove she intended to kill her baby and that a post-trial investigation of her defense team for an ethical misstep at trial deprived her of conflict-free counsel. We grant relief on the factual sufficiency issue only.

## FACTS

Two months after turning eighteen, Airman Riley left a reclusive childhood and her hometown of Cusick, Washington, to begin active duty as a B–1 bomber maintenance crewman at Dyess AFB, Texas. In early April, 1995, she complained to her supervisor that she was cramping, spotting, and had not had a menstrual cycle in about six months. At his urging, she went to the Dyess AFB hospital and reported her problems to Dr. Clinton, an ER physician. Dr. Clinton examined her abdominal area and listened to her breathing and heart. After Airman Riley declined a pelvic examination, Dr. Clinton gave her a shot of Toradol for pain and sent her home. Airman Riley returned to Dr. Clinton twelve days later complaining of cold symptoms, nausea, and tightness in her chest. After a brief examination that included another abdominal exam, Dr. Clinton gave her breathing treatments, a decongestant, and an antibiotic, then sent her home.

At some point in April, 1995, Airman Riley told a friend that she had not had her period in months and that a home pregnancy test returned positive. The friend told Airman Riley that the positive test result could be from stress, or something she ate or drank, but urged her to go to the hospital. Airman Riley made an OB/GYN appointment for April 25, 1995, but cancelled it after working an extended shift the night before. The Dyess hospital records show no other OB/GYN appointment for Airman Riley before or after the 25th of April.

On July 2, 1995, Airman Riley joined her friend Gina in a one-hour game of racquetball. That evening, Airman Riley called her supervisor and complained that she was cramping "real bad," spotting, in pain, and wanted the night off. He refused. Airman Riley arrived at work at 11 p.m., but was released at 3 a.m. the next morning because of "obvious pain." At 6 a.m., Airman Riley went to a friend's room wearing a baggy t-shirt, sweat shorts, and tennis shoes. She complained that her back hurt and asked to be taken to the hospital. Airman Riley had a difficult time sitting in the car and cried the entire way to the hospital.

Airman Riley arrived at the Dyess ER at 6:30 a.m. on July 3, 1995. The ER was quiet and empty—the patient before Airman Riley had arrived at 5:49 a.m. and the next patient didn't arrive until 9:20 a.m. Airman Riley was holding her back and crying when she met the ER technicians, and told them that she hurt her back playing racquetball the previous day. As she spoke to the technicians, she went back and forth from sitting to crouching to squatting. It seemed to the technicians that her pain was coming "in waves." They took her vital signs, then brought her to Exam Room 2 to be seen by Dr. Frey, a contract physician from Maryland who was scheduled to finish his 16-hour shift at 7:00 a.m., then fly back to Maryland.

Dr. Frey began the exam by asking Airman Riley what was wrong. Airman Riley complained of pain in her lower left back from playing racquetball. After examining her back, Dr. Frey ordered a shot of Toradol for pain and released her. Airman Riley returned to the waiting room for release where she sat doubled-over and crying. The three ER technicians on-duty became concerned and asked the incoming physician, Dr. Chengson, to look at her.

When Dr. Chengson approached Airman Riley in the waiting room, she was sitting sideways in her chair, stooped over. Dr. Chengson looked at Airman Riley's charts, then began to ask her questions. Airman Riley told Dr. Chengson that she had just started her menstrual period for the first

time in a year and needed something for her cramps. Dr. Chengson ordered a pregnancy test and had Airman Riley brought to Exam Room 2. Airman Riley sat in the exam room crouched over on a foot stool. She was having crying spells and would drop to her knees on the floor in spasms of pain. Once blood was drawn for the pregnancy test, Dr. Chengson told Airman Riley that they would report the result back to her immediately and then left the room.

Airman Riley walked into the hallway and asked one of the ER technicians where the restroom was. He directed Airman Riley to a small bathroom adjacent to Exam Room 2 and 10– to 15–feet across the hall diagonally from the ER reception desk. The 7'8" × 4'5" restroom was just big enough for the door to swing open in front of a sink and toilet, with a trash can to the side on the tile floor and an emergency pull cord near the sink. The ER technicians testified that it was easy to hear things in the bathroom from their desk, such as the toilet flushing and the paper towel roller being used.

The ER technicians heard Airman Riley continuing to softly moan and cry after she entered the restroom, but didn't hear any other unusual sounds. After some time had passed, one of the ER technicians knocked on the door. Airman Riley replied, "I'll be out in a few minutes, sir." Another ER technician knocked two more times. The first time she responded, "Yes sir." The second time she said she had been sick and needed a mop. The technician told her that Dr. Chengson was waiting for her. When Airman Riley walked out of the restroom the technician noticed blood on her legs. He asked Airman Riley about it and she replied that she was menstruating. A technician called housekeeping to clean the restroom since Airman Riley said that she had gotten sick. All total, Airman Riley spent 30 to 45 minutes in the restroom.

The pregnancy test was positive, and Dr. Chengson was waiting in the exam room for Airman Riley with a chaperon. When Airman Riley walked in, she was upright, pale, and seemed anxious to go home. Dr. Chengson performed an abdominal exam and took her heart-rate, which was at 150. Dr. Chengson then proceeded to do a pelvic exam and immediately noticed fresh lacerations going in several directions and hematomas. He asked Airman Riley how this had happened. She responded that she had hurt herself in a rollerblading accident.

While Airman Riley was in the exam room, a woman from housekeeping found the body of an infant girl among wads of paper towels in the ER restroom trash can. Within a few hours, a detective from the Abilene Police Department and an Air Force Office of Special Investigations (AFOSI) agent began an investigation of the crime scene. They found the restroom floor covered with blood, though obvious attempts had been made to wipe it up. There was blood splatter on the wall on both sides of the toilet and bare footprints in the blood on the floor. Among Airman Riley's clothes seized as evidence was her t-shirt, which showed the outline of an infant held against her chest with its head near her left shoulder.

After being kept in the hospital overnight, Airman Riley received a transfusion of two pints of blood to replace the blood she had lost. As Airman Riley was receiving the transfusion, the investigators sat down, explained to her that she was not in custody, and began interrogating her. Airman Riley explained that, once in the restroom, she sat on the toilet and began to instinctively push. She pushed two or three times, then the baby "squirted out" onto the floor. When she looked down, it wasn't moving, crying or breathing. Airman Riley said she moved the baby around, put her hand on its chest, listened for a heartbeat, pulled the arms up, lifted its feet, poked it, turned it on its side and tried spanking it. Airman Riley admitted to avoiding the possibility that she was pregnant, but repeatedly denied that she killed her baby.

An autopsy indicated that the baby was born alive because the lungs were aerated in an even pattern. The autopsy revealed symmetrical parietal fractures above both ears leading to the top of the skull in an "H" pattern. The cause of death was determined to be a blunt force crush of the skull resulting in traumatic injury to the brain and brain stem. The medical examiner testified at trial

that there is relatively little research in the area of infant skull fractures. He explained that the majority view holds that short falls would rarely cause this type of injury, while the minority view holds that short falls have a significant potential for fatality. The medical examiner opined that the most likely cause of the skull fracture was one or two impacts of the skull against a hard flat surface with significant force.

The prosecution also called an Air Force pediatrician with 14 years experience, who was studying abusive head trauma under a fellowship in medical child abuse and neglect. This expert suggested that the symmetrical fracture patterns were caused by a crushing of both sides of the skull at once. On cross-examination, the expert acknowledged that the injuries could have resulted from Airman Riley falling onto the infant's head after giving birth. He stated that the other relatively minor injuries, such as a frontal scalp contusion and bruising on the neck, could have resulted from unassisted delivery.

The defense called a nurse midwife, who had delivered approximately 1000 babies and assisted in the delivery of another 2000 to 3000 births, as an expert in pregnancy and childbirth. She testified that a woman will feel a strong and pronounced need to go to the bathroom for a bowel movement when the first urge to push comes during labor. She then described the introspection of a woman during the birthing process, the frequent uncontrollable shaking following birth that occurs as a result of muscles relaxing after being contracted, and the frequency of weakness, dizziness, increased pulse rate, and fainting caused by blood loss and pain. She also testified that an unassisted birth will produce an "explosive" delivery. When this happens, the tears in the perineum will go in different directions and the pain will be greater than the typical childbirth. Finally, she testified that loss of two pints of blood and a pulse rate of 150 were consistent with shock and momentary fainting.

The members ultimately convicted Airman Riley of unpremeditated murder.

## FACTUAL SUFFICIENCY

There is no dispute that Airman Riley's daughter was born alive or that the cause of her death was a blunt force crush of her skull. The question we must answer is whether we are convinced, beyond a reasonable doubt, that (1) Airman Riley fractured her daughter's skull (2) with the intent to kill or inflict great bodily harm. *See* Article 66(c), UCMJ, 10 U.S.C. § 866(c).

The test for determining factual sufficiency is whether, after weighing the evidence in the record and making allowances for not having personally observed the witnesses, the members of this Court are convinced of the appellant's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324, 324–25 (C.M.A.1987). Review of the factual sufficiency of evidence is limited to the "entire record," which includes only that evidence admitted at trial and exposed to the crucible or right of cross-examination. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Bethea,* 46 C.M.R. 223, 224–25, 1973 WL 14486 (C.M.A.1973).

The elements of unpremeditated murder are:
(a) That a certain named or described person is dead;
(b) That the death resulted from the act or omission of the accused;
(c) That the killing was unlawful; and
(d) That, at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon a person.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (MCM) Part IV, ¶ 43b(2) (1995 ed.).

The prosecution never advanced any single manner of killing. Rather, the prosecution suggested that the skull fractures could have been caused by Airman Riley stomping on her daughter's head, crushing her head between the toilet seat and rim, or by using her as a battering ram against the wall. No physical evidence or expert testimony was presented to explain why one of these theories was stronger than another, nor was evidence of a detailed crime scene analysis offered, such as an analysis of the blood splatter depicted in the photos admitted as prosecution exhibits. *See United*

*States v. Meeks,* 35 M.J. 64 (C.M.A.1992) (admissibility of expert testimony concerning crime scene analysis); *United States v. Mustafa,* 22 M.J. 165 (C.M.A.1986) (admissibility of expert testimony concerning blood splatter analysis). The prosecution argued that Airman Riley's acts of denial leading up to the birth demonstrated a motive to kill and that her acts of deception afterwards showed consciousness of guilt, leaving it to the members to sort out the details.

The testimony of the government experts left open the possibility that the skull fractures occurred during the delivery process, as a result of the baby falling to the floor after delivery, or as a result of Airman Riley falling onto her baby. Both experts stated that they deemed the first two possibilities unlikely. Neither expert testified, however, that the injuries were less likely to have resulted from Airman Riley falling onto her daughter than the theories advanced by the prosecution. The defense expert testified in detail concerning the explosive nature of unassisted deliveries and the conditions that follow, including uncontrollable shaking, dizziness, weakness and shock.

There are a number of uncontroverted facts that we find difficult to reconcile with the prosecution's suggested theories. The three ER technicians, who were sitting 10- to 15-feet from the restroom, could hear Airman Riley softly crying and moaning and the paper towel dispenser being used, yet they heard no sounds of stomping, banging against the wall, or slamming of the toilet seat. There is no evidence that the baby was choked or strangled, which would seem the obvious choice for quickly muffling and killing an unwanted baby. The unrebutted testimony of the defense expert indicates that Airman Riley would have been weak, dizzy, and in a state of shock following delivery, a condition that is hardly consistent with being able to carry out the unusual choice of killing by means of crushing a skull.

None of the physical evidence or expert testimony presented in this case persuades us to accept any one of the many possible explanations for the injuries. Similarly, we are not persuaded that Airman Riley's acts of deception following the delivery can only be explained by consciousness of intentional murder. Her witless attempts at deception after the delivery parallel her naive response to clear indications of pregnancy during the preceding months. In this regard, we note that medical professionals also overlooked Airman Riley's pregnancy on three occasions. She did not hide the obvious signs of her pregnancy from others and told at least one friend that a pregnancy test had returned positive. She reported cramping, spotting, and missing her menstrual cycle to Dr. Clinton and her supervisor and, on the morning of her delivery, she asked to be taken to the hospital.

We are not convinced, beyond a reasonable doubt, that Airman Riley fractured her daughter's skull with the intent to kill or inflict great bodily harm. We are convinced, however, that Airman Riley's disregard for the foreseeable consequences of refusing and impeding assistance in the delivery and care of her child constituted culpable negligence and was the proximate cause of her child's death. Dr. Chengson began the process of providing care and assistance when he ordered the pregnancy test. That care remained present and available until the death of Airman Riley's daughter. Airman Riley specifically turned that care and assistance away three separate times while she was in the restroom. In doing so, she acted as a wall between her child and the immediately available care that the child needed. These acts demonstrated a degree of carelessness greater than simple negligence and were accompanied by a culpable disregard for the foreseeable consequences. Article 119(b)(1), UCMJ; 10 U.S.C. § 919(b)(1).

We recognize that trial defense counsel persuaded the military judge not to instruct the members on failure to seek medical care as a basis for finding Airman Riley guilty of any offenses. However, Airman Riley did not merely fail to seek medical care—she obstructed it with a culpable disregard for the foreseeable consequences to her newborn daughter. Thus, we are convinced beyond a reasonable doubt that Airman Riley is guilty of the lesser-included offense of involuntary manslaughter through culpable negligence.

■ Now, we must determine whether to reassess the sentence or send the case back for a rehearing on sentence. *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990). We are convinced that, based on the circumstances of this case, the members would have adjudged the maximum available punishment of a dishonorable discharge, 10 years confinement, forfeiture of all pay and allowances, and reduction to E–1. *See* MCM, Part IV, ¶ 44e(2) (1995 ed.). Moreover, we find that sentence appropriate under the circumstances of this case.

### DENIAL OF CONFLICT–FREE COUNSEL DURING CLEMENCY REVIEW

Following counsels' arguments on findings, the trial judge *sua sponte* instructed the members that they could reconsider any finding of guilt until announcement of sentence. The members initially convicted Airman Riley of premeditated murder. During sentencing, the defense presented the results of a sanity board evaluation. The board's conclusions were that Airman Riley witnessed and was subject to physical and sexual family abuse at an early age; that her mother was overprotective; that her maturity level was at the range of a 12– to 13–year–old; that she had long-standing low self-esteem; and that she was in denial of her pregnancy.

While discussing the sentencing instructions, trial defense counsel asked the judge to instruct the members on reconsideration as he had during findings. The trial judge refused, but allowed defense counsel to remind the members during sentencing argument that they could reconsider findings before announcing the sentence. The members returned from sentencing deliberations and reported that the sanity board exhibit led to a vote for reconsideration of findings. After the military judge instructed on reconsideration, the members returned with a revised finding of guilt to the lesser-included-offense of unpremeditated murder.

In April 1996, Colonel Infelise, Chief Government Trial and Appellate Counsel, became concerned that the defense team committed an ethical breach at trial by asking the military judge to repeat the reconsidera-tion instruction and later reminding the members of that instruction during argument. The judge's reconsideration instruction was contrary to a then recent change to Rule for Courts–Martial (R.C.M.) 924(a) (amended effective June 10, 1995), which provides that members may reconsider any finding before announcing *such finding* in open court.

Both trial defense counsel learned of the possibility of an ethics inquiry in May of 1996. However, it was not until June 3, 1996, that Colonel Infelise asked the Air Force Legal Services Agency (AFLSA) Commander to start a formal ethics inquiry. On July 3, 1996, the AFLSA Commander directed a preliminary inquiry into the allegation. Ultimately, the Judge Advocate General's Advisory Committee on Ethics and Standards determined that both defense counsel knew before sentencing that the judge's instruction conflicted with R.C.M. 924(a) and they violated the rule of candor toward the tribunal by failing to bring the discrepancy to the judge's attention. Air Force Rules of Professional Conduct, Rule 3.3(a)(3), Candor Toward the Tribunal (TJAG Policy Letter 26, 3 October 1997); MODEL CODE OF PROFESSIONAL RESPONSIBILITY, Rule 3.3(A)(3) (1996). Both trial defense counsel received letters of admonishment from the AFLSA Commander on December 2, 1996.

On appeal, Airman Riley has submitted an affidavit stating that, before the convening authority took action in this case, she learned from her fiance that her lawyers were "under investigation" for something connected to her case. However, she has never personally voiced any objection, then or now, to her trial defense counsel continuing to represent her or pointed to any deficiency in their representation. Instead, appellate defense counsel argue that trial defense counsel could not have devoted their full attention to appellant when they had to defend themselves against accusations of unethical conduct. Appellate defense counsel assert this "raises the concern" that trial defense counsel might have refrained from aggressively defending Airman Riley out of concern for their own vulnerability. Moreover, appellate defense counsel contend that the staff judge advocate

and AFLSA Commander had affirmative obligations to ensure Airman Riley received conflict-free counsel once the ethics inquiry began.

 We start with the rule that a military accused is entitled to effective, conflict-free representation. *United States v. Washington,* 42 M.J. 547, 552 (A.F.Ct.Crim.App. 1995), *aff'd,* 46 M.J. 477 (1997). We generally presume that trial defense counsel's performance is competent. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, an accused may be prejudiced when defense counsel is burdened by an actual conflict of interest. *Strickland,* 466 U.S. at 691–92, 104 S.Ct. at 2066–67; *United States v. Babbitt,* 26 M.J. 157, 158 (C.M.A.1988). When an actual conflict of interest adversely affects counsel's performance, a due process violation occurs. *United States v. Tripp,* 38 M.J. 554, 557 (A.F.C.M.R.1993) (insufficient showing of actual conflict or prejudice arising from disciplinary action against defense counsel), *pet. denied,* 40 M.J. 303 (1994). However, to obtain relief, an appellant must show that both an actual conflict of interest existed and it had an adverse affect on counsel's performance; mere suspicion as to either will not suffice. *Id.*

 First, we turn to Airman Riley's assertion that her defense counsel were concentrating on defending themselves against alleged ethics violations during the post-trial processing of her case. Both defense counsel learned of the *possibility* of an inquiry in May 1996, but that inquiry did not begin until July 3, 1996. Neither defense counsel was contacted for a statement until August 1996. Thus, no inquiry had even been directed for counsel to defend against at the time clemency matters were submitted. There is no evidence before us that defense counsel were concentrating on defending themselves at all during the post-trial processing of Airman Riley's case. Thus, there is no evidence to support an assertion of actual conflict.

Next we turn to her argument that defense counsel may have refrained from aggressively defending her during post-trial proceedings. Airman Riley points to nothing that indicates anything short of zealous advocacy on the part of her attorneys in their approach to clemency. To the contrary, her defense counsel submitted an impassioned five-page argument to the convening authority asking that he reconsider both the findings and sentence. Her attorneys asked for an opportunity to meet with the convening authority face-to-face and, when turned down, asked again. They submitted 53 letters on Airman Riley's behalf from expert witnesses, supervisors, co-workers, friends and family. We find no merit in appellate defense counsel's argument that trial defense counsel may have refrained from aggressively defending her.

In summary, appellate defense counsel's "concern" that trial defense counsel may have refrained from aggressively defending Airman Riley is no more convincing than Sergeant Tripp's assertion that his defense counsel "may have been distracted by his own personal problems." *Tripp,* 38 M.J. at 557. Moreover, Airman Riley's affidavit does not even hint that she was dissatisfied with her lawyers' post-trial performance. With only appellate defense counsel's arguments complaining about her dissatisfaction, we conclude appellant has fallen far short of meeting her burden for relief. *See United States v. Ellis,* 47 M.J. 20 (1997) (no affidavit from appellant raising issue of ineffective representation).

### CONCLUSION

We approve only a finding of guilty to the lesser-included offense of involuntary manslaughter through culpable negligence. We reassess the sentence based on our modified findings and approve only so much of the sentence as provides for a dishonorable discharge, 10 years confinement, forfeiture of all pay and allowances, and reduction to E–1. The findings, as modified, and sentence, as reassessed, are

**AFFIRMED.**

Judges MORGAN and SPISAK concur.