UNITED STATES

v.

**Airman Leslie D. RILEY, United States Air Force.**

**ACM 32183(f rev).**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 17 Feb. 1996.

Decided 19 Oct. 2001.

**552**

Appellate Counsel for Appellant: Lieutenant Colonel Beverly B. Knott, Lieutenant Colonel Timothy W. Murphy, and Captain Karen L. Hecker.

Appellate Counsel for the United States: Colonel Anthony P. Dattilo and Major Lance B. Sigmon.

Before YOUNG, Chief Judge, SCHLEGEL, and HEAD, Appellate Military Judges.

## OPINION OF THE COURT UPON FURTHER REVIEW

YOUNG, Chief Judge:

The United States Court of Appeals for the Armed Forces (CAAF) has remanded the appellant's case to this Court for a second time to clarify ambiguous findings. 55 M.J. 185 (2001). Upon further review, we affirm a finding of guilty of involuntary manslaughter.

### I. Background

Court members convicted the appellant of the unpremeditated murder of an infant to which she had just given birth in a bathroom located in the Dyess Air Force Base Hospital Emergency Room. Article 118(2), UCMJ, 10 U.S.C. § 918(2). They sentenced her to a dishonorable discharge, confinement for 25 years, forfeiture of all pay and allowances, and reduction to E-1. This Court was "not convinced, beyond a reasonable doubt, that Airman Riley fractured her daughter's skull with the intent to kill or inflict great bodily harm." 47 M.J. 603, 608 (A.F.Ct.Crim.App. 1997). Instead, we affirmed a conviction for the lesser included offense of involuntary manslaughter through culpable negligence. Article 119(b)(1), UCMJ, 10 U.S.C. § 919(b)(1). Our finding was based on two theories: (1) The appellant failed to summon medical assistance for the baby; and (2) The appellant intentionally prevented medical intervention to save the baby's life.

The CAAF held that the appellant's conviction for involuntary manslaughter violated due process because the prosecution had expressly disclaimed the first theory and the second theory was never presented to the trier of fact. The CAAF remanded the case to this Court, as follows:

> It is clear from the opinion of the court below that it found the evidence factually insufficient to support a conviction of unpremeditated murder. 47 M.J. at 608. It is not clear, however, whether that court also found the evidence factually insufficient to support a conviction of a lesser-included offense premised on negligent infliction of the fatal injuries on the baby. Accordingly, we will remand the case to the court below for clarification of its decision and reconsideration under correct legal principles. Reconsideration must be consistent with our holding that culpability based on the withholding of medical care, either intentionally or negligently, was never submitted to the trier of fact and thus is precluded as a basis for affirmance, as a matter of due process.

50 M.J. at 416.

In reviewing the evidence, we determined on the initial remand that we were not bound by any of our previous findings of fact that were clearly erroneous. We found the following two findings from our initial opinion were clearly erroneous: (1) No witness testified the injuries were less likely to have been sustained by the appellant falling onto her daughter; and (2) There was no evidence that the baby was choked or strangled. We then concluded "beyond a reasonable doubt [that] the appellant stuffed a paper towel in

her baby's mouth to muffle any cries and then applied force to the skull of her infant in a gross and reckless manner which, when viewed in the light of human experience, might foreseeably result in the infant's death." 52 M.J. 825, 829 (A.F.Ct.Crim.App. 2000).

The CAAF decided that, by reconsidering the facts, we exceeded the scope of the original remand.

> The mandate of this Court was to clarify ambiguous findings. A mandate to clarify a finding that the evidence was insufficient to establish the manner of death does not encompass overturning that finding and substituting specific findings that appellee stuffed a paper towel into the baby's mouth and applied force to the baby's skull.

55 M.J. at 189.

## II. Facts

■ Shortly before her 19th birthday, in April 1995, the appellant complained to her supervisor that she was cramping, spotting, and had not had a menstrual cycle in about six months. Around the same time period, the appellant told a friend that she had not had her period in months and that a home pregnancy test she had taken had been positive. Despite the urgings of her friend and her supervisor to seek medical assistance, the appellant procrastinated about making an appointment and canceled at least one of the appointments she made. Eventually, she saw an emergency room physician, but vigorously denied she could be pregnant and would not permit him to perform a pelvic examination that would have revealed her pregnancy. The doctor injected her with a painkiller and released her. She returned 12 days later complaining of cold symptoms and was given breathing treatments, a decongestant, and an antibiotic.

On 2 July, after playing racquetball, the appellant telephoned her supervisor and told him that she was cramping "real bad," spotting, in pain, and wanted the night off. He refused to grant her request. The appellant worked from 2300 to 0300. She was released early because she was in obvious pain. At 0600, she convinced a friend to drive her to the hospital. The appellant cried the entire way. At the hospital, the appellant told the treating physician that she had injured her back playing racquetball. He injected her with a painkiller. While the appellant was in the waiting room awaiting her release, she sat doubled-over and crying. Medical technicians became concerned and asked the incoming physician, Dr. Chengson, to examine her.

The appellant told Dr. Chengson that she had just started her menstrual period for the first time in a year and needed something for her cramps. Dr. Chengson asked her if she could be pregnant; she flatly denied being pregnant. Nevertheless, Dr. Chengson decided to draw blood for a pregnancy test. The appellant did not stop him. While awaiting the results of the test, Dr. Chengson went to his office.

The appellant asked one of the medical technicians where the restroom was, and he directed her to a small bathroom adjacent to one of the examination rooms. She was in the bathroom for 45–50 minutes. She sat on the toilet and pushed, feeling like she was having a strong bowel movement. She looked down and saw "hair that wasn't" hers. She removed her underwear, shorts, and sneakers. She pushed again and a baby girl "squirted out" onto the hard tile bathroom floor (Prosecution Exhibit 7). The appellant ripped the umbilical cord from the child and discarded her in the trashcan. A member of the hospital janitorial staff called to clean up the bloody mess in the bathroom found the lifeless body of the baby in the trashcan. The autopsy revealed that the baby had been born alive and that the cause of death was a crush injury of the head that fractured the skull.

## III. Discussion

In our initial decision, 47 M.J. 603, we made two legal errors not noted by the CAAF: (1) We suggested that the court members and this Court, as a whole, had to agree on the manner in which the appellant killed her daughter; and (2) We believed that, in order to sustain a conviction, this Court had to be convinced of the appellant's guilt of each element of the offense beyond a

reasonable doubt. We now understand that neither proposition is legally correct.

(1) In our initial decision, we declared that, "None of the physical evidence or expert testimony presented in this case persuades us to accept any one of the many possible explanations for the injuries." 47 M.J. at 608. But, there is no requirement that this Court or the court members at trial agree "which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States,* 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). As long as majorities of each court believed the evidence was sufficient to establish each element of the offense, they were not required to agree on the specific means by which the baby died.

(2) When this Court disapproved the appellant's conviction for unpremeditated murder, it did so because it was not convinced of the appellant's guilt beyond a reasonable doubt. 50 M.J. at 607. The beyond-a-reasonable-doubt standard of review for factual sufficiency was established by our superior court. "For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of [Criminal Appeals] are themselves convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987). *See United States v. Hendon,* 22 C.M.R. 219, 223, 1956 WL 4758 (C.M.A. 1956) (holding that Board of Review's opinion must not have concerned factual sufficiency because "[the Board's] members did not assert that they personally were not convinced beyond a reasonable doubt that the accused intended to remain away permanently"). *See also United States v. Nazario,* 56 M.J. 572 (A.F.Ct.Crim.App.2001) (providing history of standard for factual sufficiency).

We now understand, that Congress meant us to apply a different standard. *See Nazario,* at 574–75; *United States v. Washington,* 54 M.J. 936, 940–41 (A.F.Ct.Crim.App.2001). "The [Courts of Criminal Appeals] shall af-

firm a finding of guilty of an offense or a lesser included offense (see art. 59) if it determines that the finding *conforms to the weight of the evidence* and that there has been no error of law which prejudices the substantial rights of the accused. (See art. 59 commentary.)" S.Rep. No. 81–486, at 28 (1949); H.R.Rep. No. 81–491, at 31–32 (1949) (emphasis added). "Conforms to the weight of the evidence" appears to be synonymous with the preponderance of the evidence. *See Washington,* 54 M.J. at 940–41.

We must now decide what to do with this appellant's case. The elements of the offense of involuntary manslaughter are as follows:

(1) That a certain named or described person is dead;

(2) That the death resulted from the act or omission of the accused;

(3) That the killing was unlawful; and

(4) That this act or omission of the accused constituted culpable negligence, or occurred while the accused was perpetrating or attempting to perpetrate an offense directly affecting the person other than burglary, sodomy, rape, robbery, or aggravated arson.

*Manual for Courts–Martial, United States (MCM),* Part IV, ¶ 44b(2) (1994 ed.).

The elements of the offense of negligent homicide are as follows:

(1) That a certain person is dead;

(2) That this death resulted from the act or failure to act of the accused;

(3) That the killing by the accused was unlawful;

(4) That the act or failure to act of the accused which caused the death amounted to simple negligence; and

(5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*MCM,* Part IV, ¶ 85b.

These offenses are basically the same, except involuntary manslaughter requires a higher degree of carelessness. "Simple negligence is the absence of due care, that is, an

act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care of the safety of others which a reasonably careful person would have exercised under the same or similar circumstances." *MCM*, Part IV, ¶ 85c(2).

Culpable negligence is a degree of carelessness greater than simple negligence. It is a negligent act ... accompanied by a culpable disregard for the foreseeable consequences to others of that act.... Thus, the basis of a charge of involuntary manslaughter may be a negligent act ... which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not necessarily be a natural and probable consequence of the act or omission.

*MCM*, Part IV, ¶ 44c(2)(a)(i).

During the Article 39(a), UCMJ, 10 U.S.C. § 839(a), session to discuss instructions, the defense suggested the military judge should not instruct the members that they could find the appellant guilty because of the appellant's failure to act. The military judge agreed that the court members could not convict on the theory that the appellant failed to summon medical assistance. Although he originally insisted on "retaining language referring to appellant's failure 'to prevent the fracture of' her baby's skull," 50 M.J. at 419–20 (Crawford, J., dissenting), the military judge later decided not to so instruct with regard to involuntary manslaughter. The military judge did instruct that the appellant could be convicted of negligent homicide on a theory that she failed to prevent the fracture of the baby's skull.

The remand limits our scope of review to deciding whether the evidence is factually sufficient to support a conviction "premised on negligent infliction of the fatal injuries on the baby." 50 M.J. at 416. After carefully considering all of the evidence of record, the initial findings of this Court, and the remands from the CAAF, we conclude the evidence is sufficient to support a conviction for involuntary manslaughter whether we apply the test mandated by Congress or that decreed by the CAAF. The appellant gave birth to a child, delivering her head-first onto the hard ceramic tile on the bathroom floor.

The resulting crush-fracture of the skull was the proximate cause of the baby's death. Choosing to deliver the child from the toilet seat onto the hard tile floor was more than an absence of due care. It was an act in total disregard for the baby's safety and, when viewed in the light of human experience, might foreseeably have resulted in the death of the child.

## IV. The Sentence

In *United States v. Sales*, 22 M.J. 305, 307 (C.M.A.1986), our superior court determined that, when prejudicial error occurs at trial, a court of criminal appeals must order a rehearing, instead of reassessing the sentence, if "it cannot reliably determine what sentence would have been imposed at the trial level if the error had not occurred." In our opinion on initial remand, we distinguished between reassessing the sentence after finding prejudicial error and after finding the evidence incorrect in fact. We determined that when we substitute "our judgment on findings for those of the court members, *it makes no sense* to try to determine what the court members would have done had they come to the same conclusion as we did." *Riley*, 52 M.J. at 830 (emphasis added). We affirmed a sentence of a dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to E–1.

The CAAF disagreed with our analysis: "We hold that if a Court of Criminal Appeals determines that a finding of guilty should not be affirmed, that determination means that the appellant has been wrongly convicted and is entitled to sentence reassessment under the principles announced in *Sales*." 55 M.J. at 190. The CAAF further opined that, "In light of the lower court's conclusion that it could not reliably determine what sentence would have been imposed at the trial level absent the error, we will require a sentence rehearing if the court below affirms any finding of guilty." *Id.*

With all due respect, this Court's decision not to apply *Sales* was not based on a conclusion that we "could not reliably determine what sentence would have been imposed at the trial level absent the error." We were confident we could determine what the court members would have done had they reached

**556**

the same conclusion that the appellant was guilty of involuntary manslaughter rather than murder. We just did not believe it was sound or reasonable to do so. Furthermore, the Supreme Court has found "no authority in the Uniform Code of Military Justice" for remanding a case for a rehearing on sentence alone. *Jackson v. Taylor*, 353 U.S. 569, 579, 77 S.Ct. 1027, 1 L.Ed.2d 1045 (1957). "The reason is, of course, that the Congress intended that the [Court of Criminal Appeals] should exercise this power. This is true because the nature of a court-martial proceeding makes it impractical and unfeasible to remand for the purpose of sentencing alone." *Id.* *See United States v. Sills*, —— M.J. ——, 2001 WL 1338955, ACM 34323 (A.F.Ct.Crim.App.2001) (providing full discussion of *Jackson* and Courts of Criminal Appeals' sentencing authority). Sending a case back for a rehearing on sentence alone inevitably entails the detailing of court members who did not participate in the original trial.

> Such a procedure would merely substitute one group of nonparticipants in the original trial for another. Congress thought the [Court of Criminal Appeals] could modify sentences when appropriate more expeditiously, more intelligently, and more fairly. Acting on a national basis the [Court of Criminal Appeals] can correct disparities in sentences and through its legally-trained personnel determine more appropriately the proper disposition to be made of the cases. Congress must have known of the problems inherent in rehearing and review proceedings for the procedures were adopted largely from prior law. It is not for us to question the judgment of the Congress in selecting the process it chose.

*Id.* at 580, 77 S.Ct. 1027.

 We concur with Judge Breslin's assessment of this Court's sentencing authority:

> We conclude that the will of Congress, as expressed in the plain language of the statute and applied by the Supreme Court in *Jackson v. Taylor*, is that this Court has the responsibility and authority to reassess this sentence, regardless of whether we can determine what the original trial court would have done. Furthermore, there is

no statutory or regulatory requirement that we return this case or any case for a rehearing on sentencing alone.

*Sills*, at *19.

We recognize that we are not normally free to disregard the CAAF's mandate. With all due respect to the CAAF, we see no need or statutory authority to send this case back for a rehearing on sentence. We are confident we can determine an appropriate sentence. Furthermore, a precedent of the Supreme Court "must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982). As there has been no intervening decision of the Supreme Court, and the issue decided in *Jackson* was the interpretation of Article 66(c) with which we are faced in this case, we believe it is appropriate for this Court to reassess the sentence.

After considering the record of trial and all matters submitted in clemency, and having given individualized consideration to this appellant on the basis of the nature and seriousness of the offense and the character of the offender, we affirm a sentence of a dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, and reduction to E–1. *See United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982).

The modified findings and sentence are

AFFIRMED.