**UNITED STATES, Appellee,**

v.

**Leslie D. RILEY, Airman, U.S.
Air Force, Appellant.**

No. 98–0146.
Crim.App. No. 32183.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 18, 1998.

Decided June 14, 1999.

Crawford, J., filed dissenting opinion.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and SULLIVAN and EFFRON, JJ., joined. CRAWFORD, J., filed a dissenting opinion.

For Appellant: *Robert E. Watson* (argued); *Colonel Douglas H. Kohrt* and *Captain Harold M. Vaught* (on brief); *Lieutenant Colonel Ray T. Blank.*

For Appellee: *Captain Steven D. Dubriske* (argued); *Colonel Anthony P. Dattilo* and *Lieutenant Colonel Michael J. Breslin* (on brief); *Colonel Brenda J. Hollis* and *Major J. Robert Cantrall.*

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to her pleas, of premeditated murder of her newborn baby, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. Before announcing sentence, however, the court-martial reconsidered[1] and reduced its finding to unpremeditated murder, also in violation of Article 118. The adjudged and approved sentence provided for a dishonorable discharge, confinement for 25 years, total forfeitures, and reduction to the lowest enlisted grade.

---

1. RCM 924(a) was amended in 1995. The amended version is in Manual for Courts-Martial, United States (1998 edition).

The Court of Criminal Appeals affirmed only the lesser-included offense of involuntary manslaughter, in violation of Article 119, UCMJ, 10 USC § 919, and reassessed the sentence to a dishonorable discharge, confinement for 10 years, total forfeitures, and reduction to the lower enlisted grade. 47 MJ 603, 610.

Before this Court, appellant argues that the decision of the court below was contrary to the "law of the case," violated due process, and was not supported by the evidence.[2] For the reasons set out below, we hold that the Court of Criminal Appeals erred by affirming a conviction of a lesser-included offense based on appellant's "refusing and impeding assistance in the delivery and care of her child." 47 MJ at 608.

### Factual Background

The Court of Criminal Appeals conducted an exhaustive analysis of the evidence and based its decision on the factual insufficiency of the evidence. Because the correctness of the lower court's decision depends in large part on that court's factual analysis, we consider it necessary to set out in detail the facts on which the court below rendered its decision. Our resolution of this case is based on application of the law to the facts as found by the court below, which we adopt for the purposes of this decision. The relevant facts are as follows:

In early April, 1995, [appellant] complained to her supervisor that she was cramping, spotting, and had not had a menstrual cycle in about six months. At his urging, she went to the Dyess AFB hospital and reported her problems to Dr. Clinton, an ER physician. Dr. Clinton examined her abdominal area and listened to her breathing and heart. After Airman Riley declined a pelvic examination, Dr. Clinton gave her a shot of Toradol for pain and sent her home. Airman Riley returned to Dr. Clinton twelve days later complaining of cold symptoms, nausea, and tightness in her chest. After a brief examination that included another abdominal exam, Dr.

2. This Court granted review of the following issues:

I
WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS, AFTER FINDING THAT THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO ESTABLISH THAT AIRMAN RILEY INTENDED TO KILL OR INFLICT GREAT BODILY HARM UPON HER NEW BORN INFANT DAUGHTER, ERRED WHEN IT AFFIRMED A CONVICTION FOR INVOLUNTARY MANSLAUGHTER WHERE:
A. SUCH A FINDING WAS CONTRARY TO THE "LAW OF THE CASE" SINCE TRIAL COUNSEL AFFIRMATIVELY ASSERTED THAT THE GOVERNMENT WAS NOT PROCEEDING UNDER ANY THEORY OF CULPABILITY ARISING FROM THE FAILURE TO SUMMON MEDICAL CARE AND THE MILITARY JUDGE INSTRUCTED THE MEMBERS THAT THEY COULD NOT CONVICT AIRMAN RILEY ON SUCH A THEORY;
B. SUBSTITUTING AN ALLEGATION THAT THE CAUSE OF DEATH WAS THE REFUSAL AND IMPEDANCE OF ASSISTANCE AND CARE FOR THE INFANT WAS A FATAL VARIANCE FROM THE CHARGED SPECIFICATION WHICH ALLEGED THE CAUSE OF DEATH AS THE INTENTIONAL FRACTURING OF THE INFANT'S SKULL, AND THUS DENIED AIRMAN RILEY OF THE DUE PROCESS REQUIREMENT OF NOTICE;

C. AIRMAN RILEY WAS DENIED THE RIGHT TO HAVE HER GUILT OR INNOCENCE DETERMINED BY THE MEMBERS SINCE THE MEMBERS, HAVING CONVICTED HER OF UNPREMEDITATED MURDER, NEVER, PURSUANT TO THE MILITARY JUDGE'S INSTRUCTIONS, CONSIDERED WHETHER THE NEGLIGENCE OF THE AIR FORCE DOCTORS WAS A SUFFICIENT INTERVENING PROXIMATE CAUSE TO RELIEVE HER OF CRIMINAL LIABILITY;
D. SINCE THERE IS NO EVIDENCE THAT THE INFANT WAS ALIVE DURING "THE THREE SEPARATE TIMES" WHEN AIRMAN RILEY ALLEGEDLY TURNED AWAY CARE AND ASSISTANCE WHILE IN THE HOSPITAL BATHROOM, THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION OF INVOLUNTARY MANSLAUGHTER.
II
WHETHER THE AIR FORCE COURT OF CRIMINAL APPEALS ERRED WHEN, AFTER HAVING FOUND THE EVIDENCE TO BE SUFFICIENT ONLY TO SUPPORT A CONVICTION FOR THE LEGALLY LESS SERIOUS OFFENSE OF INVOLUNTARY MANSLAUGHTER, IT REASSESSED THE "MAXIMUM AVAILABLE PUNISHMENT."
In view of our resolution of Issue I, we need not address Issue II.

Clinton gave her breathing treatments, a decongestant, and an antibiotic, then sent her home.

At some point in April, 1995, Airman Riley told a friend that she had not had her period in months and that a home pregnancy test returned positive. The friend told Airman Riley that the positive test result could be from stress, or something she ate or drank, but urged her to go to the hospital. Airman Riley made an OB/GYN appointment for April 25, 1995, but cancelled it after working an extended shift the night before. The Dyess hospital records show no other OB/GYN appointment for Airman Riley before or after the 25th of April.

On July 2, 1995, Airman Riley joined her friend Gina in a one-hour game of racquetball. That evening, Airman Riley called her supervisor and complained that she was cramping "real bad," spotting, in pain, and wanted the night off. He refused. Airman Riley arrived at work at 11 p.m., but was released at 3 a.m. the next morning because of "obvious pain." At 6 a.m., Airman Riley went to a friend's room wearing a baggy t-shirt, sweat shorts, and tennis shoes. She complained that her back hurt and asked to be taken to the hospital. Airman Riley had a difficult time sitting in the car and cried the entire way to the hospital.

Airman Riley arrived at the Dyess ER at 6:30 a.m. on July 3, 1995. The ER was quiet and empty—the patient before Airman Riley had arrived at 5:49 a.m. and the next patient didn't arrive until 9:20 a.m. Airman Riley was holding her back and crying when she met the ER technicians, and told them that she hurt her back playing racquetball the previous day. As she spoke to the technicians, she went back and forth from sitting to crouching to squatting. It seemed to the technicians that her pain was coming "in waves." They took her vital signs, then brought her to Exam Room 2 to be seen by Dr. Frey, a contract physician from Maryland who was scheduled to finish his 16–hour shift at 7:00 a.m., then fly back to Maryland.

Dr. Frey began the exam by asking Airman Riley what was wrong. Airman Riley complained of pain in her lower left back from playing racquetball. After examining her back, Dr. Frey ordered a shot of Toradol for pain and released her. Airman Riley returned to the waiting room for release where she sat doubled-over and crying. The three ER technicians on-duty became concerned and asked the incoming physician, Dr. Chengson, to look at her.

When Dr. Chengson approached Airman Riley in the waiting room, she was sitting sideways in her chair, stooped over. Dr. Chengson looked at Airman Riley's charts, then began to ask her questions. Airman Riley told Dr. Chengson that she had just started her menstrual period for the first time in a year and needed something for her cramps. Dr. Chengson ordered a pregnancy test and had Airman Riley brought to Exam Room 2. Airman Riley sat in the exam room crouched over on a foot stool. She was having crying spells and would drop to her knees on the floor in spasms of pain. Once blood was drawn for the pregnancy test, Dr. Chengson told Airman Riley that they would report the result back to her immediately and then left the room.

Airman Riley walked into the hallway and asked one of the ER technicians where the restroom was. He directed Airman Riley to a small bathroom adjacent to Exam Room 2 and 10– to 15–feet across the hall diagonally from the ER reception desk. The 7'8" × 4'5" restroom was just big enough for the door to swing open in front of a sink and toilet, with a trash can to the side on the tile floor and an emergency pull cord near the sink. The ER technicians testified that it was easy to hear things in the bathroom from their desk, such as the toilet flushing and the paper towel roller being used.

The ER technicians heard Airman Riley continuing to softly moan and cry after she entered the restroom, but didn't hear any other unusual sounds. After some time had passed, one of the ER technicians knocked on the door. Airman Riley replied, "I'll be out in a few minutes, sir."

Another ER technician knocked two more times. The first time she responded, "Yes sir." The second time she said she had been sick and needed a mop. The technician told her that Dr. Chengson was waiting for her. When Airman Riley walked out of the restroom the technician noticed blood on her legs. He asked Airman Riley about it and she replied that she was menstruating. A technician called housekeeping to clean the restroom since Airman Riley said that she had gotten sick. All total, Airman Riley spent 30 to 45 minutes in the restroom.

The pregnancy test was positive, and Dr. Chengson was waiting in the exam room for Airman Riley with a chaperon. When Airman Riley walked in, she was upright, pale, and seemed anxious to go home. Dr. Chengson performed an abdominal exam and took her heart-rate, which was at 150. Dr. Chengson then proceeded to do a pelvic exam and immediately noticed fresh lacerations going in several directions and hematomas. He asked Airman Riley how this had happened. She responded that she had hurt herself in a rollerblading accident.

While Airman Riley was in the exam room, a woman from housekeeping found the body of an infant girl among wads of paper towels in the ER restroom trash can. Within a few hours, a detective from the Abilene Police Department and an Air Force Office of Special Investigations (AFOSI) agent began an investigation of the crime scene. They found the restroom floor covered with blood, though obvious attempts had been made to wipe it up. There was blood splatter on the wall on both sides of the toilet and bare footprints in the blood on the floor. Among Airman Riley's clothes seized as evidence was her t-shirt, which showed the outline of an infant held against her chest with its head near her left shoulder.

After being kept in the hospital overnight, Airman Riley received a transfusion of two pints of blood to replace the blood she had lost. As Airman Riley was receiving the transfusion, the investigators sat down, explained to her that she was not in custody, and began interrogating her. Airman Riley explained that, once in the restroom, she sat on the toilet and began to instinctively push. She pushed two or three times, then the baby "squirted out" onto the floor. When she looked down, it wasn't moving, crying or breathing. Airman Riley said she moved the baby around, put her hand on its chest, listened for a heartbeat, pulled the arms up, lifted its feet, poked it, turned it on its side and tried spanking it. Airman Riley admitted to avoiding the possibility that she was pregnant, but repeatedly denied that she killed her baby.

An autopsy indicated that the baby was born alive because the lungs were aerated in an even pattern. The autopsy revealed symmetrical parietal fractures above both ears leading to the top of the skull in an "H" pattern. The cause of death was determined to be a blunt force crush of the skull resulting in traumatic injury to the brain and brain stem. The medical examiner testified at trial that there is relatively little research in the area of infant skull fractures. He explained that the majority view holds that short falls would rarely cause this type of injury, while the minority view holds that short falls have a significant potential for fatality. The medical examiner opined that the most likely cause of the skull fracture was one or two impacts of the skull against a hard flat surface with significant force.

The prosecution also called an Air Force pediatrician with 14 years experience, who was studying abusive head trauma under a fellowship in medical child abuse and neglect. This expert suggested that the symmetrical fracture patterns were caused by a crushing of both sides of the skull at once. On cross-examination, the expert acknowledged that the injuries could have resulted from Airman Riley falling onto the infant's head after giving birth. He stated that the other relatively minor injuries, such as a frontal scalp contusion and bruising on the neck, could have resulted from unassisted delivery.

The defense called a nurse midwife, who had delivered approximately 1000 babies and assisted in the delivery of another 2000 to 3000 births, as an expert in pregnancy and childbirth. She testified that a woman will feel a strong and pronounced need to go to the bathroom for a bowel movement when the first urge to push comes during labor. She then described the introspection of a woman during the birthing process, the frequent uncontrollable shaking following birth that occurs as a result of muscles relaxing after being contracted, and the frequency of weakness, dizziness, increased pulse rate, and fainting caused by blood loss and pain. She also testified that an unassisted birth will produce an "explosive" delivery. When this happens, the tears in the perineum will go in different directions and the pain will be greater than the typical childbirth. Finally, she testified that loss of two pints of blood and a pulse rate of 150 were consistent with shock and momentary fainting.

47 MJ at 605–07.

The specification on which appellant was arraigned alleged that she did, "on or about 3 July 1995, with premeditation, murder Infant Riley, also known as Baby Girl Riley, by means of fracturing her skull." The theory of the prosecution was that appellant intentionally killed her baby. In his closing argument, trial counsel anticipated the military judge's instruction on the lesser-included offenses of involuntary manslaughter and negligent homicide and asserted that those offenses "just simply don't apply in this case." Commenting on appellant's responses to the ER technicians who knocked on the bathroom door, trial counsel argued that her responses were evidence of premeditation: She was about to kill her baby and did not "want to be discovered."

The theory of the defense was that the baby was killed when she fell to the floor during the birthing process, through no fault of appellant. The defense argued that appellant's responses to the ER technicians did not show premeditation or intent because appellant thought that her baby was already dead when they knocked on the door. The defense relied heavily on appellant's pretrial statement, where she repeatedly insisted that she did not kill her baby, but that "it fell on the floor. . . . It cracked it's [sic] head[.] It was dead."

During an Article 39(a), UCMJ, 10 USC § 839(a), session convened to discuss the instructions on findings, the military judge informed counsel for both sides of his intent to instruct the court-martial that voluntary manslaughter, involuntary manslaughter, and negligent homicide were lesser-included offenses. His proposed instruction would have advised the court-martial that an element of the lesser-included offenses was that appellant "failed to prevent the fracture of Baby Girl Riley's skull or failed to summon medical assistance which was immediately available for the infant."

The defense objected to any instruction on culpable negligence by failure to act, arguing that the Government had charged appellant with a culpable act but not with a culpable failure to act, and that amending the specification to include a failure to act would be a major change to the specification. The prosecution agreed in part, informing the military judge "that we have never been proceeding under the theory, and do not intend to argue, that Airman Riley's culpability stems from failure to summon medical assistance."

The military judge then deleted the reference to failure to summon medical assistance but retained his description of culpable negligence by failure to prevent the fracture of the baby's skull. The instruction on the lesser-included offense of involuntary manslaughter that was ultimately given omitted any reference to "failure to act." In fact the judge specifically told the members to delete that language from their copy of the written instructions. In his instruction on the lesser-included offense of negligent homicide, the military judge instructed the court-martial on "failure to act"; he also "instructed that Airman Riley's failure to summon medical assistance may not, as a matter of law, constitute the negligent act or failure to act set out above."

The prosecution's argument on the merits was consistent with the military judge's instructions. Trial counsel argued:

> In discussing the offenses of negligence, [defense counsel] was very clear to point out, and the judge is going to tell you exactly the same thing, that the failure to summon medical assistance cannot be the basis of a finding of the negligence, the negligence of homicide. It cannot. The judge is going to tell you that. . . . But what it can be considered for is evidence like intent and premeditation.

The court-martial initially found appellant guilty of premeditated murder. After the court-martial closed to deliberate on sentence, the members decided to reconsider their findings after considering an affidavit from a military psychiatrist that had been presented by the defense in extenuation and mitigation. The members reconsidered and found appellant not guilty of premeditated murder but guilty of unpremeditated murder.

The Court of Criminal Appeals set aside the conviction of unpremeditated murder for factual insufficiency, *i.e.*, it was not convinced beyond a reasonable doubt of appellant's guilt of that offense. *See* Art. 66(c), UCMJ, 10 USC § 866(c) (1994); *United States v. Turner*, 25 MJ 324, 325 (CMA 1987). The court framed the issue before it as follows: "The question we must answer is whether we are convinced, beyond a reasonable doubt, that (1) Airman Riley fractured her daughter's skull (2) with the intent to kill or inflict great bodily harm." 47 MJ at 607.

The court related the various theories of culpability advanced by the prosecution: that appellant intentionally killed the baby by "stomping on her daughter's head, crushing her head between the toilet seat and rim, or by using her as a battering ram against the wall." *Id.* It also considered the evidence supporting the theory that appellant negligently killed the baby "as a result of the baby falling to the floor after delivery, or as a result of Airman Riley falling onto her baby." 47 MJ at 608. The court commented, "None of the physical evidence or expert testimony presented in this case persuades us to accept any one of the many possible explanations for the injuries." *Id.*

The court concluded its analysis by holding, "We are not convinced, beyond a reasonable doubt, that Airman Riley fractured her daughter's skull with the intent to kill or inflict great bodily harm." The court made no specific findings concerning the factual sufficiency of the evidence to support any of the lesser-included offenses submitted to the court-martial, all of which were premised on negligent infliction of the fatal injuries. The court held, however, that appellant's "disregard for the foreseeable consequences of refusing and impeding assistance in the delivery and care of her child constituted culpable negligence and was the proximate cause of her child's death." Based on this rationale, the court below affirmed the lesser-included offense of involuntary manslaughter through culpable negligence. *Id.* at 608.

### Discussion

 Appellate courts have authority to set aside a finding of guilty and affirm only a finding of a lesser-included offense. Art. 59(b), UCMJ, 10 USC § 859(b). That authority, however, is not without limits. An appellate court may not affirm an included offense on "a theory not presented to the" trier of fact. *Chiarella v. United States*, 445 U.S. 222, 236, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *United States v. Standifer*, 40 MJ 440, 445 (CMA 1994). To do so "offends the most basic notions of due process," because it violates an accused's "right to be heard on the specific charges of which he [or she] is accused." *Dunn v. United States*, 442 U.S. 100, 106, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979). Accordingly, we hold that neither this Court nor the court below may affirm appellant's conviction on a theory of failure to summon medical assistance.

The Government concedes that the law of the case would preclude affirming a conviction based on appellant's failure to act. Answer to Final Brief at 18. The Government argues, however, that the doctrine is a discretionary policy, not a mandatory rule of law. *Id.* at 14. The Government further argues that the Court of Criminal Appeals'

decision does not offend due process, because the lesser-included offense affirmed by that court was premised on intentional acts designed to impede or prevent medical care from being administered to the baby, and not a mere failure to summon medical assistance. *Id.* at 18–20.

We reject the Government's due process argument. Like the theory that appellant failed to summon medical assistance, which was expressly disclaimed by the prosecution, this theory of intentional prevention of medical intervention was not asserted by the prosecution and was never submitted to the trier of fact. Thus, appellant was never given an opportunity to defend against it. To affirm on this theory would violate due process. *See Dunn.*

Finally, the Government argues that, if the lower court's theory of culpability was incorrect, this Court should remand the case for further consideration under correct legal principles. Answer, *supra* at 25–26. We agree that a remand is appropriate, but for a different reason.

Under Article 67(c), UCMJ, 10 USC § 867(c) (1994), we "may act only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the Court of Criminal Appeals." If the lower court exercises its unique factfinding power and sets aside a finding of guilty as incorrect in fact, as opposed to incorrect in law, then that decision is virtually unreviewable by this Court. It is clear from the opinion of the court below that it found the evidence factually insufficient to support a conviction of unpremeditated murder. 47 MJ at 608. It is not clear, however, whether that court also found the evidence factually insufficient to support a conviction of a lesser-included offense premised on negligent infliction of the fatal injuries on the baby. Accordingly, we will remand the case to the court below for clarification of its decision and reconsideration under correct legal principles. Recon-

sideration must be consistent with our holding that culpability based on the withholding of medical care, either intentionally or negligently, was never submitted to the trier of fact and thus is precluded as a basis for affirmance, as a matter of due process.

### Decision

The decision of the United States Air Force Court of Criminal Appeals is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for remand to the Court of Criminal Appeals for clarification of its holding and reconsideration consistent with the principles of due process set out above. In the event that any findings and sentence are affirmed on reconsideration, the case will be returned directly to this Court.

CRAWFORD, Judge (dissenting):

I disagree with the majority as to the holding of the Court of Criminal Appeals. 50 MJ at 415. The court differentiated between disregard for the foreseeable consequences of refusing to seek medical assistance and finding appellant obstructed medical care "with a culpable disregard for the foreseeable consequences to her newborn daughter." 47 MJ at 608. Additionally, the failure to summon medical attention was only removed from the panel's consideration, and subsequently from the court's, as to negligent homicide. The facts reveal a calculated effort by appellant to act as an obstacle between her baby's struggle to survive and the medical care offered to her. It would be a true miscarriage of justice to reverse the conviction in this case.

On July 3, 1995, appellant, herself 19 years old, gave birth to a full-term and otherwise healthy baby girl in an emergency-room bathroom at Dyess Air Force Base, Texas. Until that day, she had fully denied her pregnancy to friends, doctors, and, possibly, even herself.[1] A hospital custodian found the baby dead in the bathroom trashcan under

---

1. Defense counsel raised the possibility that appellant was in a state of psychological denial of her pregnancy; but they never raised any mental-defect-type defense. It was undetermined at trial whether she knew she was pregnant and

just chose not to deal with it, hoping it would go away, or she had honestly convinced herself that all the changes in her body could not be related to a pregnancy.

many paper towels. An autopsy revealed that the baby had been born alive and had died from a "crush" injury to her skull.

Apparently, appellant had her first and only sexual experience while drunk one night at Tech School shortly after joining the Air Force. Though she was gaining weight despite dieting, went without menstruation for one year, suffered unusual cramping and lower back pain, had cravings and oily skin, and experienced occasional spotting, she claims she at no time thought she was actually pregnant. Particularly during the latter part of her second trimester and her third trimester, appellant spoke to several friends about her concerns that she had not had a menstrual cycle in months and that she had severe cramps. She even performed a home pregnancy test, which turned out positive. Yet, she continually denied she could be pregnant and sought other explanations for these symptoms of pregnancy. Her friends, who thought appellant was a virgin, agreed with her self-diagnosis, but entreated her to see a gynecologist for a professional explanation.

Appellant made an appointment at the OB/GYN clinic, but canceled it. She also went to the emergency room for menstrual cramps or flu-like symptoms on at least two occasions. She adamantly denied that she could be pregnant when the subject was broached by the attending physician and refused a pelvic examination which would have revealed her true state of pregnancy.

On the day she went to the emergency room and eventually gave birth, she told the first doctor to see her, as well as the emergency room technicians, that she was suffering severe back pain from a racquetball injury. When the pain medication she was given for her professed symptoms did not have any effect and a second doctor approached her, she told him that she was also suffering severe cramps that might need additional pain killers. At this point, she told him that she was beginning her first menstrual cycle since June 1994. When the doctor asked if she could be pregnant, she said no, though he

eventually persuaded her to give blood for a pregnancy test.

Appellant refused to lay upon the gurney while the blood was being drawn, indicating that she was more comfortable and the pain was less severe when she stood or squatted. While waiting for the pregnancy test results, Dr. Chengson went to his office to study some files.[2] Appellant asked a technician where the bathroom was located. She was in the bathroom for 45–50 minutes.

She stated in her interview with an Abilene, Texas, detective and a military investigator that when she went into the bathroom, she sat on the toilet and pushed instinctively, feeling like she was about to have a strong bowel movement. After a couple of pushes, she looked down and saw "hair that wasn't hers." At some point, the evidence shows, she entirely removed her panties, shorts, and sneakers. According to appellant's statement, after another push or two, the baby "squirted out" onto the floor face-up. Also, according to her statement, the infant never cried or moved or opened its eyes; did not have a heartbeat that she could feel; and did not respond to appellant's prodding and slapping her. She washed the baby off, pulled the umbilical cord from her, flushed the placenta and the cord down the toilet, put the baby in the trash, and then tried to clean the blood from the floor. Two technicians knocked on the door a total of three times to see if she was okay, and she always responded calmly that she was fine. The third time, she requested a mop, stating that she had been sick in the bathroom and wanted to clean it up. The technician told her someone else would clean it up and that Dr. Chengson and a chaperone were waiting to see her.

When appellant emerged from the bathroom, she was walking erect but gingerly, and seemed to be in less pain. In fact, she asked if she could go home. Dr. Chengson told her the pregnancy test results were positive and that he needed to do an abdominal and pelvic exam. The examination revealed a fundus consistent with about 16 weeks' pregnancy, which, coincidentally, is

**2.** It is implied in his testimony that one of the files he studied at this time was that comprising

the records of appellant's visits to the hospital.

also consistent with that just following the birthing process. He asked her to prepare for a pelvic exam. Appellant told the chaperone that she had injured her vaginal area rollerblading the day before and that she had packed her bleeding vagina with paper towels. However, the testimony of one of appellant's friends was that they had wanted to go rollerblading, but had been unable to borrow any blades.

Dr. Chengson was shocked at the amount of trauma to appellant's vagina and suspected a mutilation attack or vicious rape. Pursuant to hospital practice, he called for the assistance of the OB/GYN doctor on-call. When Dr. O'Young and her chaperone arrived to continue the pelvic exam, she too was shocked at the trauma. She was also concerned about the bleeding and the health of the baby, so she performed an ultrasound, which revealed no baby in the womb but a cluster of either blood clots or a part of the placenta still attached to the uterus. She asked appellant several times whether she had passed any fetal tissue, baby parts, or a fetus, but appellant always answered in the negative. While Dr. O'Young was out of the room attempting to get appellant admitted to the OB/GYN clinic for care, appellant asked the chaperone if she had miscarried and seemed to latch on to that explanation.

It was at this time that the custodian discovered the baby's body in the trashcan. Dr. Chengson called Dr. O'Young over and they both examined the baby, concluding that it was dead and beyond resuscitation. They also both noticed a rolled up paper towel protruding from the baby's mouth. However, that towel was never observed by the investigators and was not mentioned by the court below. Dr. O'Young searched the trash bag for the placenta, but never found it. Assuming that the baby was appellant's, Dr. O'Young determined that surgery would be needed to confirm that the placenta was not still in her uterus, bleeding out. The medical staff agreed that no one was to tell appellant about the discovery, that the crime scene should be preserved, and that the Air Force investigators and civilian police should be notified.

The autopsy revealed signs that the baby had been born alive, including evenly aerated lungs and a hemorrhage where the umbilical cord had been yanked from the baby's body. In addition, the autopsy revealed that the cause of death had been a "crush injury of the head that ha[d] fractured the skull." The medical examiner also found abrasions on the baby's neck "consistent with and suspicious of fingernail markings."

Thus, the court below found appellant guilty of the lesser-included offense of involuntary manslaughter. The court determined that "based on the circumstances of this case, the members would have adjudged the maximum available punishment of a dishonorable discharge, 10 years confinement, forfeiture of all pay and allowances, and reduction to E–1," which it found an appropriate sentence. 47 MJ at 609.

The only other issue before the Court of Criminal Appeals was whether appellant was prejudiced by her trial defense counsels' conflict of interest, in that they "could not have devoted their full attention to appellant when they had to defend themselves against accusations of unethical conduct." *Id.* Though this issue is not raised before this Court, the relevant facts may have some application to our consideration of some of the raised issues. Specifically, the trial defense team was the object of an informal, and then formal, ethics inquiry beginning in April 1996. "Ultimately, the Judge Advocate General's Advisory Committee on Ethics and Standards determined that both defense counsel knew before sentencing that the judge's instruction [allowing the members to reconsider their findings after they had been announced, as requested by defense counsel] conflicted with RCM 924(a) and they violated the rule of candor toward the tribunal by failing to bring the discrepancy to the judge's attention.... Both trial defense counsel received letters of admonishment from the AFLSA Commander...." *Id.* The court below found appellant's argument unpersuasive. *Id.* at 610.

## DISCUSSION

### A. The Instructions on Appellant's Failure to Act or Summon Medical Care:

During an Article 39(a) session at which the military judge, trial counsel, and defense

counsel discussed the proposed instructions, individual defense counsel noted his concern that, while the Charge and specification did not allege appellant's failure to act as a means of culpability, the proposed instructions did. The military judge agreed with the defense counsel to a point. He agreed to strike "or failed to summon medical assistance which was immediately available for the infant" where it appeared in the instructions. Trial counsel concurred, stating that the Government "ha[d] never been proceeding under the theory, and do not intend to argue, that [appellant's] culpability stems from failure to summon medical assistance."

However, the military judge was very adamant about retaining language referring to appellant's failure "to prevent the fracture of" her baby's skull, stating that, "based on facts and the evidence that has been available to the defense, I would think, since this interview [depicted in Prosecution Exhibits 36 and 37] was taken on 4 July 1995." The following colloquy followed:

> IDC: If, indeed, we have been put on notice that her failure to prevent the fracture of her daughter's skull was somehow an issue, we would have unequivocally put on Mental Health testimony regarding her state of mind in the restroom and her ability to prevent the fracture of Baby Girl Riley's skull. That would be an additional
> . . .
> MJ: I would just simply say that it seems inconceivable to me that anyone who has read the transcript of that interview on 4 July 1995 would not be on notice that that's an issue. To the extent that you've made your record on that, then that seems to me to be well preserved. Notwithstanding that position, I'm going to instruct as I have set forth there.
> IDC: Understood, your Honor. With regard to the part that you have agreed to remove from this instruction, we would request a specific instruction to the members that Airman Riley's failure to summon medical assistance from the bathroom is not to be considered in the issue of negligent homicide.
> MJ: All right. Does the government have any position with regard to that request?

> TC: Well only if you're going to specifically mention what that fact cannot be used for. Then we would also request that you instruct something along the lines of, however, it could be considered by them in the areas of, perhaps, intent or consciousness of guilt.
> MJ: You see the point there? Are you willing to . . .
> IDC: I agree, your Honor. I think the danger is great enough to justify what might seem, on its face, to be a harmful instruction. Perhaps the language that Captain Meier is concerned about would be more properly inserted at the point in the instructions where they talk about circumstantial evidence. I think that's where Captain Meier was going with that.
> MJ: Well, I think if I'm going to make a specific instruction along those lines, it would appear to me that rather than putting it in two parts in the instruction, it would seem to naturally flow that one follows the other.
> IDC: To some extent, I agree.

The next morning, individual defense counsel brought the issue up again in the following colloquy:

> IDC: Yes, your Honor. I beg the court's forgiveness for not bringing this up yesterday during our instructions session. As we thought last night about the instruction on negligent homicide, in particular, that portion of the instruction that deals with Airman Riley's failure to act, failure to prevent the fracture of her infant's skull, of course, it was our position from the outset that that instruction was inappropriate. As we came to understand the court's position that perhaps Airman Riley could have prevented the fracture, for example, if she had caught the baby during delivery, we began to believe and believe this morning that an instruction on physical impossibility should be given if, in fact, that is what the court is thinking in the arena of this failure to act.
> MJ: That would appear to me to be what's naturally raised by the evidence, based on the facts as we know them. The failure to

prevent the fracture in the negligent homicide specification would, in the court's view, be along the lines you stated, some action or some inaction on Airman Riley's part which amounts to negligence, which did not prevent this skull of the infant being fractured, the fracture which caused the death of the infant. . . .

\* \* \*

MJ: I believe, regardless of the timing of this request, defense counsel, that it does appear to be a fair request, based on the status of the evidence with regard to the lesser included offense of negligent homicide. . . .

## B. Law of the Case:

### 1. The Doctrine:

The Supreme Court of the United States has held that "the law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.' A court has the power to revisit prior decisions of its own or of a coordinate court in any . . . circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988), quoting *Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); and then *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). The Supreme Court has also noted that the doctrine "directs a court's discretion, it does not limit the tribunal's power." 460 U.S. at 618, 103 S.Ct. 1382.

Justice Brennan, joined by Justices Blackmun and Stevens, wrote a separate opinion in *Arizona v. California, supra,* in which they discussed the principle of "finality" and its application to the law-of-the-case doctrine, writing

that "finality" means different things in different contexts, and that the law accords finality different weight depending on the context. . . . In a case such as this, when a party seeks reconsideration of questions decided at an earlier stage of a single, continuing litigation, the law allows courts more discretion than in a case in which the party wants to upset a final judgment in another proceeding, before another judge. See generally 1B J. Moore & T. Currier, Moore's Federal Practice [paras.] 0.401, 0.404[1] (1982) (hereinafter Moore); cf. *United States v. United States Smelting Refining & Mining Co.,* 339 U.S. 186, 199, 70 S.Ct. 537, 94 L.Ed. 750 (1950).

A final judgment makes a difference. It marks a formal point at which considerations of economy, certainty, reliance, and comity take on more strength than they have before the judgment. A court's decision to reconsider a prior ruling before the case becomes final, however, is ultimately a matter of "good sense." Moore § 0.404[10], at 573. Concern for finality remains an important policy, even before final judgment. In the absence of some overriding reason, a court should be reluctant to reopen that which has been decided merely to correct an error, even though it has the power to do so. Nevertheless, federal courts have traditionally thought that correcting a manifest injustice was reason enough to reconsider a prior ruling. . . .

460 U.S. at 643–44, 103 S.Ct. 1382 (citations omitted) (concurring in part and dissenting in part).

### 2. The Facts of This Case:

Appellant's law-of-the-case argument is based on the claim that the Court of Criminal Appeals' decision "imputes liability on the appellant for failing to seek medical care." Final Brief at 9. Technically, that is not the basis for the lower court's decision. They found her guilty of involuntary manslaughter through culpable negligence based on her "disregard for the foreseeable consequences of refusing and impeding assistance in the delivery and care of her child." The court differentiated this from the "failure to seek medical care," on which it recognized "that trial defense counsel persuaded the military judge not to instruct the members," stating that appellant "did not merely fail to seek medical care—she obstructed it with a culpa-

ble disregard for the foreseeable consequences to her newborn daughter." 47 MJ at 608.

This effort to distinguish was not necessary.

First of all, the military judge himself very consciously made the same distinction, as evidenced in those colloquies detailed in Part A of this discussion. Second, in reading through the actual instructions given to the members, I note that the "failure to summon medical" attention was only removed from their consideration with regard to the one lesser-included offense of negligent homicide, about which the military judge specifically said: "In deciding the issue of negligence, you are instructed that Airman Riley's failure to summon medical assistance may not, as a matter of law, constitute the negligent act or failure to act set out above."

The military judge did have the members scratch "or failure to act" from the discussion of proximate cause in relation to culpable negligence during the involuntary-manslaughter portion of the instructions, but again, the Court of Criminal Appeals found appellant guilty of an act of obstruction, not a failure to act by failing to seek help. Otherwise, no instruction was given for this lesser-included offense similar to that given for negligent homicide. In fact, the military judge instructed the members that to find appellant guilty of involuntary manslaughter, they had to find that she "by culpable negligence, killed *or caused the death* of Baby Girl Riley." (Emphasis added.)

### 3. The Case Law:

Appellant cites *United States v. McKinley*, 27 MJ 78 (CMA 1988), in support of his proposition that the law-of-the-case doctrine applies here. We held in that case that "where (a) the Manual states that there are no lesser-included offenses; (b) the judge rules that there are no lesser-included offenses; and (c) counsel agree that there are no lesser-included offenses, such a ruling becomes the law of the case, absent *plain error* materially, prejudicing a substantial right of an accused." 27 MJ at 80. Here, the lesser-included offense was never in question; but

the theory underlying the charged offense or any of the lesser-included offenses was. However, given the discussion above, even that allegation is specious.

Furthermore, appellant overlooks the fact that the *McKinley* holding was very narrow and that the Court also noted the general practice, which is that "we have long recognized that an appellate court may disapprove a finding because proof of an essential element is lacking or, as a result of instructional errors concerning lesser-included offenses, may substitute a lesser-included offense for the disapproved findings. This is true even if the lesser-included offense was neither considered nor instructed upon at the trial of the case." 27 MJ at 79.

The Supreme Court has noted that a criminal conviction cannot be affirmed "on the basis of a theory not presented to the jury." *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). However, the facts of that case show that the theory upon which evidence was presented and the jury was instructed was that the defendant had failed "to disclose material, non-public information" to the sellers of target corporate stock, *id.* at 236, 100 S.Ct. 1108, whereas the Second Circuit had affirmed his conviction on the basis that "anyone ... who regularly receives material nonpublic information may not use [it] ... without incurring an affirmative duty to disclose." *Id.* at 231, 100 S.Ct. 1108. The elements of that duty were never presented to the jury; thus, the Supreme Court reversed.

The case sub judice is far more like the military case, *United States v. LaFontant*, 16 MJ 236 (CMA 1983). In that case, LaFontant was convicted of attempted sale of LSD and possession of LSD, but the then-Court of Military Review (*see* 41 MJ 213, 229 n. *) found that they could approve only the finding of guilty of the attempted sale and only so much of the specification of possession "as ... [found] appellant guilty of an attempt to possess LSD at the time and place and in the amount alleged." 16 MJ at 236. This Court affirmed stating: "That the members were not instructed on the elements of an attempt as they pertain to possession is of no conse-

quence since they found the accused guilty of the consummated possession of LSD, and their finding necessarily included all the elements 'of an attempt to possess LSD.'" 16 MJ at 238.

### 4. The Manifest–Injustice Exception:

The manifest-injustice exception has been recognized in this Court. For instance, in my opinion concurring in the result in *United States v. Grooters*, I noted that "[t]he 'law of the case' doctrine ... does not apply if the decision below would create 'manifest injustice,' *Dobbs v. Zant*, 506 U.S. 357, 358, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993).... 'Manifest–injustice' and 'clearly erroneous' are concepts equally applicable to decisions favoring the Government and to decisions favoring the defense." 39 MJ 269, 274 (CMA 1994).

Even if this Court were to determine that the circumstances of this record require that the law-of-the-case doctrine apply here, surely this would be an appropriate case for applying the manifest-injustice exception based on appellant's patent criminality. It would be a manifest injustice if a conviction initially established for premeditated murder and a life sentence, which was reduced once erroneously and then again on appeal, were to be reduced to nothing because of rigid adherence to a mere rule of practice: the law-of-the-case doctrine.

In addition, the record implies that the defense team did in fact get the same evidence before the members that they would have wanted the members to see had the defense pursued this theory of culpable negligence at trial and that the members only found it reduced her offense from premeditated to unpremeditated murder. The members initially found appellant guilty of the premeditated murder of her daughter. The defense erroneously urged the military judge to instruct the members that they could reconsider their findings, when, in fact, the members should not have had that opportunity. The defense counsel also reminded the members that they could still reconsider their findings during his argument on sentencing. The defense team provided the members with a copy of a letter from Dr. Raisani, the president of appellant's sanity board, for consideration on sentencing. The members specifically noted that that letter "caused" them to reconsider their findings. As a result, they changed the sentence from mandatory life to a panel-imposed 25 years.

During an Article 39(a) session on sentencing instructions, individual defense counsel made the following observation in support of submitting Dr. Raisani's letter to the members: "One of the biggest concerns in this court, one of the concerns in this court anyway has been Airman Riley's failure to summon help. *That failure to make any kind of notification* could easily be seen by these members as aggravation. If we can't attempt to explain a matter in aggravation, then Airman Riley's rights to present extenuation and mitigation don't mean much.... This is Dr. Raisani's opinion as to what her state of mind was certainly leading up to that point." (Emphasis added.) The members apparently thought Dr. Raisani made a compelling argument against life imprisonment. However, they did not find it so compelling that it required no confinement or even as little confinement as the trial counsel requested (a minimum of 20 years).

### 5. Pleadings–Elements Approach:

Finally, appellant argues that due process requires that the defendant be on notice of the charges against her, and that in the military, following a line of cases on multiplicity, that means not only that the offense be defined by statute, but also by the specifications. Final Brief at 9–10. It is important to note that this Court has never said that either the language of the specification or the elements of the statute take precedence in defining the offense. In *United States v. Weymouth*, 43 MJ 329, 333 (1995), for instance, this Court noted that the specification and the statute are read together to provide "notice of the essential elements of the offense." The Court also noted that the function of this approach was "to inform the accused of the conduct charged, to enable the accused to prepare a defense, and to protect

the accused against double jeopardy." 43 MJ at 333.

In my opinion concurring in the result in *United States v. Neblock*, 45 MJ 191, 203 (1996), I noted that the multiplicity test is not as simple as all that, stating:

> We follow the statutory-elements test: If the elements are different, one can presume, in the absence of clear congressional intent, that the offenses are not multiplicious.

> One cannot literally apply the statutory-elements test when examining offenses under Article 133 or 134, . . . . Thus, in examining those offenses, one must look at the elements in Part IV of the Manual. If the elements are the same, then one employs the pleadings-elements test. . . .

(Citations omitted.) No matter which approach you take, there is no clear indication that appellant was uninformed of the misconduct with which she was charged or unable to prepare her defense or that she will be at risk of double jeopardy. This is similar to the variance test and is discussed in greater detail below.

### C. Variance:

This Court has held that "even where there is a variance in fact, the critical question is one of prejudice." *United States v. Lee*, 1 MJ 15, 16 (CMA 1975), citing *United States v. Craig*, 8 USCMA 218, 24 CMR 28 (1957); *United States v. Hopf*, 1 USCMA 584, 5 CMR 12 (1952). With regard to prejudice, the Court has established this two-part test: "(1) has the accused been misled to the extent that he has been unable adequately to prepare for trial; and (2) is the accused fully protected against another prosecution for the same offense." 1 MJ at 16.

As noted above, appellant was on notice of what misconduct she was charged with and she was able to prepare an adequate defense. Also as noted above, she brought that same evidence which she alleged she would have brought under other circumstances before the members during the sentencing phase of the court-martial. And, because of the erroneous instruction that the members could reconsider their findings following presentation of that evidence, the members considered that evidence in reducing their finding of premeditated murder to unpremeditated murder. Thus, there was, in any event, no prejudice.

Appellant does not even bring up the double jeopardy part of the test. As the *Lee* opinion points out, it would not be applicable to the facts here anyway. The Court noted in *Lee* that "protection against double jeopardy can be predicated upon the evidence in the record of the prior prosecution. An examination of the evidence and the findings in this record demonstrates sufficient safeguards exist against another charge of wrongful possession of marijuana on the date involved. . . . Since the facts of record can readily be established, the second arm of the test for determining lack of prejudice is fully met." 1 MJ at 17. The record here is similarly fact-explicit and sufficient to guard against a second prosecution.

In those cases where this Court has found a fatal variance, the circumstances have been far more blatant and the opinions have been fact-specific. For example, in *United States v. Wray*, 17 MJ 375 (CMA 1984), the accused was charged with larceny by the taking on August 6, 1980; however, the members found him guilty of larceny by withholding on August 25, 1980.

In addition, where the Supreme Court has found a variance which "offends the most basic notions of due process," it has been because of a discrepancy between the basis upon which the Court of Appeals sustained a verdict and both the indictment and the proof at trial. *See Dunn v. United States*, 442 U.S. 100, 106, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979).

### D. Sufficient Intervening Proximate Cause:

Appellant correctly notes that the medical-malpractice evidence presented by the defense could be considered as an intervening proximate cause for the lesser-included offenses of involuntary manslaughter and negligent homicide. *See also United States v. Taylor*, 44 MJ 254 (1996). However, I reject

the argument that because the members returned a verdict first on premeditated murder and then on unpremeditated murder and therefore never reached the proximate-cause issue, that the Court of Criminal Appeals has denied appellant the right to have her verdict determined by the panel. By this reasoning, the Courts of Criminal Appeals could never substitute a lesser-included offense for the offense found at a court-martial; yet, this is a well-regarded principle of the military appellate process. *See United States v. McKinley,* 27 MJ 78.

Furthermore, appellant's argument ignores the special factfinding powers of the Courts of Criminal Appeals. *See* Art. 66(c), UCMJ, 10 USC § 866(c) (1994). Despite appellant's assertion to the contrary, Final Brief at 15 n. 4, there is evidence in the Court of Criminal Appeals' opinion that it considered the evidence of medical malpractice, 47 MJ at 608 ("[W]e note that medical professionals also overlooked Airman Riley's pregnancy on three occasions.")

### E. Legal Insufficiency:

The standard of review for legal insufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner,* 25 MJ 324 (CMA 1987), citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Appellant argues that there was no evidence at trial that any of the three times a medical technician knocked on the bathroom door the baby was actually alive. Final Brief at 14. The Court of Criminal Appeals, however, detailed appellant's culpability as follows:

Dr. Chengson began the process of providing care and assistance when he ordered the pregnancy test. That care remained present and available until the death of Airman Riley's daughter. Airman Riley specifically turned that care and assistance away three separate times while she was in the restroom. In doing so, she acted as a wall between her child and the immediate-

ly available care that the child needed. These acts demonstrated a degree of carelessness greater than simple negligence and were accompanied by a culpable disregard for the foreseeable consequences.

47 MJ at 608. Thus, the three times that medical technicians knocked on that bathroom door are the primary acts of obstruction on which the affirmed conviction of involuntary manslaughter was based.

However, it should not be assumed that these are the only acts which led the court to its decision. In fact, her decision to leave the care begun by Dr. Chengson and to go into the bathroom to give birth could be considered an act of obstruction if it is believed that she knew she was in labor, without getting into why she did not summon help once she was in the bathroom and actually giving birth.

Despite this, the three knocks on the door are the primary acts with which we must be concerned. Viewing the evidence in the light most favorable to the prosecution, I note that there is evidence in the record from which a factfinder could find that the baby was alive one or more of those times.

First of all, there is the autopsy and the testimony of Dr. Krouse, the deputy chief medical examiner. Dr. Krouse indicated that one of the three ways he could determine that the baby girl was born alive was the "[f]resh umbilical stump with fresh underlying hemorrhage." Appellant stated in her interview with Air Force and police investigators that she "ripped" the umbilical cord from the baby and "ripped" or "pulled" the placenta and cord from her uterus. Dr. Krouse testified that after death, there is "precious little hemorrhage" because "[y]ou have to have arterial blood pressure to get this kind of soft tissue hemorrhage." Thus, the factfinder could find that the hemorrhage beneath the umbilicus had to have occurred before the baby girl was dead. And, given appellant's statements to the investigators, this hemorrhage occurred before the afterbirth was naturally delivered.

Also, in response to a member's question, Dr. Krouse responded that the baby was breathing less than 4 to 6 hours, but could

give no more precise "estimate." Appellant was in the bathroom for approximately 45 minutes. The first knock on the door was approximately 30 minutes after she had gone into the bathroom. Given the doctor's estimate, the approximate time she was in the bathroom before the first technician knocked on the door, and the evidence of the baby's hemorrhages, the factfinder could have found that the baby was alive at least when the first knock came.

Additionally, defense counsel made an effort to ask the medical personnel if they even tried to resuscitate the baby when they found her in the bag, approximately a half hour after appellant exited the bathroom. While the defense team clearly tried to imply that this was part of their medical-malpractice defense, the factfinder could infer that there might have been a chance to resuscitate the baby at some time between her birth and her discovery in the trashcan, especially when viewed in conjunction with Mrs. Fox's testimony. Mrs. Fox was the chaperone who assisted Dr. O'Young. She testified that appellant asked her how long a baby could survive on its own. The factfinder could infer from that statement that the baby was still alive when appellant left the bathroom.

Furthermore, this Court has held that where "the evidence is sufficient to establish an included offense, this Court may affirm the included offense, provided that it does not do so on a theory not presented to the trier of fact." *United States v. Standifer*, 40 MJ 440, 445 (CMA 1994). As noted in the discussion above, the affirmance here was on a theory amply covered at trial.

Thus, based on the evidence presented to the members, I would affirm appellant's conviction for involuntary manslaughter. To do otherwise would result in a true miscarriage of justice.