# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

### Airman ROBERT A. JONES
### United States Air Force

### ACM 38434

### 13 March 2015

Sentence adjudged 10 May 2013 by GCM convened at Aviano Air Base, Italy. Military Judge: Dawn R. Eflein.

Approved Sentence: Dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for the Appellant: Major Anthony D. Ortiz and Major Zaven T. Saroyan.

Appellate Counsel for the United States: Major Daniel J. Breen; Major Robert Ramírez; Major Jason S. Osborne; Captain Richard J. Schrider; and Gerald R. Bruce, Esquire.

Before

HECKER, MITCHELL, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

TELLER, J., delivered the opinion of the Court, in which MITCHELL, S.J., joined. HECKER, S.J., filed a separate opinion concurring in part and dissenting in part.

Appellant was convicted, contrary to his pleas, by a panel of officer and enlisted members, of sleeping on post, breaching the peace, aggravated sexual assault, indecent

conduct, assault consummated by a battery, and drunk and disorderly conduct in violation of Articles 113, 116, 120, 128 and 134, UCMJ; 10 U.S.C. §§ 913, 916, 920, 928, 934.[1] The court sentenced him to a dishonorable discharge, three years of confinement, forfeiture of all pay and allowances, and reduction to E-1. The sentence was approved, as adjudged.

The appellant argues (1) the preferral of charges was defective, (2) the evidence related to the aggravated sexual assault specification was factually insufficient, (3) the military judge erred by allowing improper character evidence argument, and (4) the appellant was deprived of his right to a fair trial due to the military and political environment regarding sexual assault allegations.[2] This court specified an additional issue: whether the military judge's failure to instruct the members on the definition of "substantially incapable" constituted plain error.

We find the evidence to support the aggravated sexual assault specification was factually and legally insufficient, and set aside that finding. We affirm the lesser included offense of wrongful sexual contact and the remaining findings, and reassess the sentence.

*Background*

The charges in this case arise from alleged misconduct during the appellant's first two years in the Air Force. While still in technical training, the appellant is alleged to have had sexual intercourse with a fellow trainee while she was substantially incapable of declining participation in the act. Because that act occurred in a hotel room occupied by several other trainees, it also gave rise to a specification of indecent conduct. The episode did not prevent the appellant from completing training, and the appellant reported to Aviano Air Base (AB), Italy, as his first duty station. While there, the appellant engaged in a course of misconduct ranging from sleeping on post to assaulting a

---

[1] The appellant was acquitted of communicating a threat and wrongful sexual contact. The convening authority withdrew and dismissed Charge I and its Specification (resisting apprehension) after the military judge suppressed the evidence that supported Charge I. The military judge dismissed Additional Charge II and its Specification (conveying a profane message to another airman) after finding the appellant's speech was protected under the First Amendment.

[2] Issues (3) and (4) are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

fellow airman suspected of stealing food from dormitory rooms. The assignments of error all pertain to the Article 120, UCMJ specifications.[3]

The evidence relating to the specifications of sexual assault and indecent conduct is comprised of several conflicting accounts. Pursuant to our authority under Article 66, UCMJ, 10 U.S.C. § 866(c), we find the following as fact. On 11 November 2011, the appellant and several male classmates obtained a room at an off-base hotel in San Antonio, Texas, where they were attending technical training. After having several mixed drinks, the appellant and his classmates went to a nightclub, where he met Airman First Class (A1C) CH and another female airman. As A1C CH was leaving the club, she saw the appellant and a male classmate preparing to return to the hotel in a taxi. She and her companion were invited to join the appellant, and they accepted.

After arriving at the hotel, the appellant and A1C CH continued to talk. Despite hints from A1C CH that she was not romantically interested in the appellant, he continued to pursue her. At some point in the evening, A1C CH participated in a drinking game, but retained control over her physical and mental faculties. The game involved players naming some type of conduct, often sexual in nature, and the other players would either take a drink or not based on whether they had ever done whatever conduct the player described. After the drinking game, an argument between the appellant and one of the other male occupants ensued. Either coincident to or as a result of the argument, hotel security arrived outside the hotel room door to investigate a noise complaint. To defuse the argument and avoid problems with hotel security, A1C CH engaged in a "make-out kiss" with the appellant and with the other party to the argument. She kissed each of them twice.

As the occupants settled down into their sleeping arrangements, A1C CH chose a space in a bed with the appellant, who she thought was asleep. The appellant started rubbing A1C CH's leg and waist, so she got up and moved to the other bed, despite it being crowded. After five to ten minutes, both A1C CH and another male airman (A1C TN) got into bed with the appellant. A1C CH began kissing A1C TN, and made a joke related to the earlier drinking game that she had "never had a threesome." As the kissing progressed, A1C CH began to masturbate A1C TN. The appellant, who was now behind A1C CH, began to lift the back of her dress. She told the appellant to stop, which he initially did, but he soon began touching A1C CH again.

---

[3] The Article 120, UCMJ, 10 U.S.C. § 920, offenses were charged to have occurred on or about 12 November 2011. All references in this opinion to Article 120, UCMJ refer to that Article in existence at the time of the charged offense under *Manual for Courts-Martial, United States,* (*MCM*), Part IV, ¶ 45. (2008 ed.), except as specifically noted.

At some point A1C CH rolled onto her back which placed her between the appellant and A1C TN. Aggravated by the appellant's continued touching, A1C CH told them both to stop touching her. At this point, A1C TN tried to mollify her and placed his arm over her upper torso. The appellant got on top of A1C CH with her legs under and between his own. According to A1C CH, A1C TN's facial expression became serious, and he exerted enough pressure with his arm that she could not sit up. A1C CH told the appellant she did not want to have sex with him, but he persisted. The appellant pulled down A1C CH's underwear and despite the awkward position, was able to insert his penis into her vagina and soon reached orgasm.

When the appellant rolled off A1C CH, he and A1C TN exchanged a brief disrespectful remark before she confronted them, insisting that she did not want to have sex. A1C TN exclaimed that A1C CH just got raped, however his motivation for making these remarks is unclear. A1C CH got up and went to the bathroom.

While in the bathroom A1C CH became more angry at the appellant. She came out of the bathroom and physically confronted him, briefly placing her hands on his throat until she was pulled off by other airmen. She eventually calmed down, but with no way to return to base without abandoning her now drunk and sleeping female companion, she made a bed on the floor and tried to sleep. The next day, A1C CH filed a restricted report of the assault, which she later converted to an unrestricted report.

*Preferral*

The appellant argues that the Secretary of Defense's withhold of initial disposition authority converted the Special Court-Martial Convening Authority into a nominal accuser under Article 1(9), UCMJ, thereby rendering his later discretionary actions unlawful. This claim was litigated at trial and the military judge found it to be without merit. The appellant also argues that the restrictions on disposition authority tainted the preferral by apparent unlawful command influence (UCI). Trial defense counsel conceded at trial that the UCI issue was preserved only to the extent this court found the first assignment of error meritorious. Interpretation of the UCMJ and the Rules for Courts-Martial (R.C.M.) is a matter of law that we review de novo. *United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F. 2008).

On 20 April 2012, the Secretary of Defense withheld initial disposition authority for certain Article 120, UCMJ offenses from all commanders who were not designated as

a special court-martial convening authority and serving in the grade of O-6 or above. The Secretary cited R.C.M. 306 (*Initial Disposition*), 401 (*Forwarding and Disposition of Charges in General*), and 601 (*Referral*) in his memorandum. The appellant contends that preferral of charges, covered by R.C.M. 307, is one type of disposition covered by the withholding memorandum. Charges in this case subject to the withhold memorandum were preferred by the appellant's immediate commander, who was serving in the grade of O-5 and did not have court-martial convening authority.

The appellant's argument is not supported by the facts or the law. First, it is not clear that the Secretary of Defense, even if he had intended to, could alter the ability of anyone subject to the UCMJ to prefer charges under Article 30, UCMJ, 10 U.S.C. § 830. We need not reach that question, however, since the memorandum cannot be fairly interpreted to evince such intent. The memorandum, which includes explicit references to R.C.M. 306, 401 and 601, does not reference R.C.M. 307, which governs preferral of charges. The appellant argues that because R.C.M. 306 enumerates preferral of charges as one option for initial disposition, preferral should be considered part of initial disposition decision withheld under the memorandum. We decline to give the Secretary's memorandum such a strained interpretation.

We concur with the trial court that preferral of charges is distinct from initial disposition. We find the appellant's immediate commander, as he testified, preferred charges on his own authority and not as an agent of the Special Court-Martial Convening Authority. Accordingly, the Special Court-Marital Convening Authority was not a nominal accuser, nor do we impute that status to him as a result of the Secretary's memorandum. Neither the preferral of charges nor the Special Court-Martial Convening Authority's subsequent discretionary actions constituted procedural error and the appellant's first assignment of error is without merit. Because the appellant's claim of apparent UCI rests upon the proposition that the Special Court-Martial Convening Authority became a nominal accuser, we also dispose of that claim adversely to the appellant.

*Constitutional Challenge to Offense of Indecent Acts under Article 120*

The appellant was charged with committing an indecent act for engaging in sexual intercourse with A1C CH while in the same bed as A1C TN and while in close proximity to seven other airmen who were in the same hotel room. As he did at trial, the appellant argues that the indecent acts provision of Article 120, UCMJ that was in effect at the time of his offense was unconstitutionally vague and overbroad, particularly as it tended to

infringe privacy interests protected by the Constitution, and fails to provide sufficient notice of what conduct is prohibited.[4]  We review Constitutional issues de novo. *United States v. Payne*, 47 M.J. 37, 42 (C.A.A.F. 1997).

The Fifth Amendment to the Constitution requires "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  One component of due process is fair notice, the idea that "criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (quoting *Parker v. Levy*, 417 U.S. 733, 757 (1974)).  When a provision of the UCMJ is challenged for facial vagueness, courts construe its literal language in the context of other authorities that place limits upon its reach, including the Manual for Courts-Martial, federal law, state law, military case law, military custom and usage, and military regulations.  *See id.*  If, in the context of those authorities, the appellant is one to whom the description of criminality in the statute clearly applies, then he lacks standing to challenge the statute for facial vagueness.  *United States v. McGuinness*, 35 M.J. 149, 152 (C.M.A. 1992).

The Navy-Marine Corps Court of Criminal Appeals recently addressed this issue in *United States v. Miles*, NMCCA 201300272 (N.M. Ct. Crim. App. 21 August 2014) (unpub. op).  In *Miles*, the court rejected a facial vagueness challenge to Article 120(k), UCMJ, after determining that the statutory language, as informed by other sources of authority and the facts of the case at hand provided service members of ordinary intelligence fair notice of prohibited conduct.  Although the opinion was unpublished, we find its analysis on this point persuasive.  Our prior case law, as well as that of our superior court, has long held that lawful "sexual activity can be 'indecent' if committed in public or in an 'open and notorious' manner, meaning it occurs under circumstances where it is 'reasonably likely' to be seen by another person or where the actor knows another person is present, even though the other person did not actually observe the act." *United States v. Burkhart*, 72 M.J. 590, 596 (A.F. Crt. Crim. App. 2013) (quoting *United States v. Izquierdo*, 51 M.J. 421, 423 (C.A.A.F. 1999); *United States v. Sims*, 57 M.J. 419, 421-22 (C.A.A.F. 2002)).  In this case, the appellant engaged in sexual activity despite the immediate presence—and likely observation—of several other airmen.  Our superior court has also recently reaffirmed that such open and notorious activity was not plainly private and therefore did not fall within the privacy interests

---

[4] The pertinent provision of Article 120, UCMJ, provides that "Any person subject to this chapter who engages in indecent conduct is guilty of an indecent act and shall be punished as a court-martial may direct." *MCM*, Part IV, ¶ 45.a.(k).  The elements for indecent act are (1) "That the accused engaged in certain conduct" and (2) "[t]hat the conduct was indecent conduct." *Id*. at ¶ 45.b.(11).  "[I]ndecent" is defined as "generally signifies that form of immorality relating to sexual impurity that is not only grossly vulgar, obscene, and repugnant to common propriety, but also tends to excite lust and deprave the morals with respect to sexual relations." *Id*. at ¶ 45.c.(3).

protected by *Lawrence v. Texas*, 539 U.S. 558 (2003). *See United States v. Goings*, 72 M.J. 202, 206 (C.A.A.F. 2013).

The plain language of Article 120(k), UCMJ, as further defined in the Manual for Courts-Martial and informed by case law, adequately provides service members of ordinary intelligence "fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). The appellant is not an entrapped innocent ensnared by language he could not have ascertained applied to him. *See McGuinness*, 35 M.J. at 152. Accordingly, he lacks standing to challenge the statute as facially vague.

*Fair Trial and the Military and Political Environment Related to Sexual Assault*

The appellant also argues, pursuant to *United States v Grostefon*, 12 M.J. 431 (C.M.A. 1982), that media coverage of events related to sexual assault in the military and political pressure during the week of his trial made it impossible for him to receive a fair trial. His assignment of errors refers to his clemency submission, where he states that pretrial publicity "impacted both the trial and the sentence [he] received" and that his period of confinement and dishonorable discharge were "a result of President Obama's urging." Since there is no evidence of pretrial publicity related to the appellant's own case, we construe that portion of his claim as asserting that publicity related to comments or prior actions of senior leaders either actually or apparently influenced his trial.

Article 37(a), UCMJ, 10 U.S.C. § 837(a) states in relevant part: "[n]o person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case." The mere appearance of unlawful command influence may be "as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Ayers*, 54 M.J. 85, 94–95 (C.A.A.F. 2000) (citation omitted) (internal quotation marks omitted). "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an intolerable strain on public perception of the military justice system." *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006) (citation omitted) (internal quotation marks omitted). "Whether the conduct of the [senior leaders] in this case created an appearance of unlawful command influence is determined objectively." *Id.* Because the focus is on the perception of fairness as viewed through the eyes of a reasonable member of the public, "the appearance of unlawful command influence will exist where an objective,

disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

The burden of raising the issue of unlawful command influence rests with trial defense counsel. *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citation omitted). The defense must: (1) "show facts which, if true, constitute unlawful command influence," and (2) show "the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *Id.* (citation omitted). To meet the threshold for raising this issue, trial defense counsel is required to present "some evidence" of unlawful command influence. *Id.* If the defense meets that burden to raise the issue, the burden shifts to the Government, who must prove beyond a reasonable doubt: (1) the predicate facts do not exist; or (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings and sentence. *Id.* at 151.

There were several high-profile events related to sexual assault in the military in the weeks leading up to the appellant's trial. The Third Air Force Commander had recently disapproved a conviction in *United States v. Wilkerson*, a previous sexual assault case at Aviano AB. That decision sparked substantial public and Congressional interest. Shortly prior to trial, the officer in charge of the Air Force Sexual Assault Prevention and Response Office had been arrested on suspicion of groping a woman. The Department of Defense had recently released statistics indicating an increase in sexual assault reports since the previous year. There were also statements from the President and Secretary of Defense expressing their concern about sexual assault, and arguably advocating specific results in prosecutions for sexual assault offenses.

In light of this media coverage, the military judge and both counsel conducted extensive voir dire of the potential members. Voir dire covered both the *Wilkerson* case specifically as well as news reports covering sexual assault in the military. The trial defense counsel, having explored the topic with each of the potential members, did not assert any challenges for cause. The defense also elected not to use its peremptory challenge. We find nothing in the record generally, nor the voir dire specifically, that suggests a logical connection between the comments complained of and this case. On the contrary, while the members had a general awareness of the comments by political leaders and varying degrees of knowledge about the *Wilkerson* case, they all agreed they would not be influenced by any of those matters in performing their court-martial duties.

Under these circumstances, we find no basis to conclude that the appellant was subject to any actual prejudice due to the attention on military sexual assault cases generally or his case in particular. *See United States v. Simpson*, 58 M.J. 368, 373 (C.A.A.F. 2003). Nor do we find that the environment created apparent unlawful command influence. An objective, disinterested, reasonable member of the public, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the appellant's court-martial proceeding. *See Lewis*, 63 M.J. at 415.

*Factual and Legal Sufficiency of Aggravated Sexual Assault Conviction*

The appellant contends the evidence was factually insufficient to support his conviction of aggravated sexual assault.[5] We also review that conviction for legal sufficiency as part of our Article 66, UCMJ review.

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). The test for factual sufficiency is whether, after weighing the evidence and making allowances for not having observed the witnesses, we ourselves are convinced of the appellant's guilt beyond a reasonable doubt. *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citing *Turner*, 25 M.J. at 325). Applying these standards to the record in this case, we find the evidence neither legally nor factually sufficient to support the specification as charged.

The difficulty for the government in this case arises because the government charged the appellant under a statutory provision dealing with A1C CH's lack of ability to decline participation when the only disagreement appears to be whether A1C CH *did* decline, not whether she *could* decline.

On appeal, the government continues to assert that its only theory of the case was that A1C TN held A1C CH's shoulders down while the appellant raped her and that A1C TN's action therefore made A1C CH "physically unable to decline participation" in

---

[5] The appellant was acquitted of wrongfully engaging in sexual contact with Airman First Class (A1C) CH by touching her breast with his hand without her permission.

the sexual act. Under that theory and under the facts adduced at trial, a more appropriate charge would have been aggravated sexual assault by causing bodily harm to A1C CH, pursuant to Article 120(c)(1)(B), UCMJ.[6] Instead, however, the appellant was charged with aggravated sexual assault under Article 120(c)(2)(B), UCMJ for committing a sexual act upon A1C CH while she was "substantially incapable of . . . declining participation in the act."

The offense of aggravated sexual assault occurs when a military member "engages in a sexual act with another person of any age if that person is substantially incapacitated or substantially incapable of (A) appraising the nature of the sexual act; (B) declining participation in the sexual act; or (C) communicating unwillingness to engage in the sexual act." Article 120(c)(2), UCMJ. The elements of the offense, as charged here, are:

> 1) that at or near San Antonio, Texas, on or about 12 November 2011, the accused engaged in a sexual act, to wit: penetration with his penis of the vulva of A1C CH; and

> 2) that the accused did so when A1C CH was substantially incapable of declining participation in the sexual act.

*Manual for Courts-Martial* (*MCM*), Part IV, ¶ 45.a.(c)(2)(B) (2008 ed.).

As discussed below, under the facts of this case and based on the specific theory of culpability selected by the government, we find the evidence insufficient to support the allegation that this sexual activity took place while A1C CH was "substantially incapable of declining participation" in the activity. We find she *was* capable of declining participation, and repeatedly did so. The appellant's disregard of her protests and subsequent sexual activity with her is, however, actionable as the offense of wrongful sexual contact.

---

[6] In this context, "'bodily harm' means any offensive touching of another, however slight." Article 120(t)(8), UCMJ; *see also United States v. Vidal*, 23 M.J. 319, 324-25 (C.M.A. 1987) (holding that a person who jointly acts to overcome a woman's resistance to intercourse may convicted of rape "even though [the government] cannot prove beyond a reasonable doubt whether he personally had intercourse or only helped someone else have intercourse with the unwilling victim.")

Our analysis depends on what is meant by being "substantially incapable of declining participation in [a] sexual act." The UCMJ does not provide a definition of this phrase. Webster's dictionary defines decline, in the context used here, as "to withhold consent." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 299 (10th ed. 1999). The *Military Judges' Benchbook* (*Benchbook*) defines "substantially incapable" and "substantially incapacitated" identically as:

> that level of mental impairment due to consumption of alcohol, drugs, or similar substance; while asleep or unconscious; or for other reasons; which rendered the alleged victim unable to appraise the nature of the sexual conduct at issue, unable to physically communicate unwillingness to engage in the sexual conduct at issue, or otherwise unable to make or communicate competent decisions.

Department of the Army Pamphlet (D.A. Pam.) 27-9, *Military Judges' Benchbook*, ¶ 3-45-5.d. (1 January 2010).

The military judge did not provide this instruction to the panel.[7] Instead, using language from Article 120(t)(14), UCMJ, in the course of instructing the panel on consent, the military judge advised them: "A person cannot consent to sexual activity if that person is substantially incapable of physically declining participation in the sexual conduct at issue."

As our superior court has held, the existence of actual consent is directly relevant to offenses brought under Article 120(c), UCMJ. "If an accused proves that the victim consented, he has necessarily proven that the victim had the capacity to consent, which logically results in the accused having disproven an element of the offense of aggravated sexual assault—that the victim was substantially incapacitated." *United States v. Prather*, 69 M.J. 338, 343 (C.A.A.F. 2011). The *Prather* court also observed that "there may exist an abstract distinction between 'substantially incapacitated' and 'substantially incapable,'" but found no meaningful constitutional distinction in that case. *Id.* While the charge in this case extends to A1C CH's being "substantially incapable," we, like our superior court and the drafters of the *Benchbook*, find no meaningful distinction between the terms "incapacitated" and "incapable" for purposes of our analysis.

---

[7] This instructional issue formed the basis of the specified issue in this case.

The necessary corollary to the court's conclusion above in *Prather* is that if the evidence shows that the alleged victim affirmatively declined participation in the sexual act, that evidence also tends to negate an essential element of the offense as charged here. Substantial incapability, as the *Benchbook* explains, is a "mental impairment . . . which rendered the alleged victim unable . . . to physically communicate unwillingness to engage in the sexual conduct at issue." *Benchbook* at ¶ 3-45-5.d. The ability of the alleged victim to affirmatively agree to participate or refuse to participate in a sexual act and communicate that decision negates the existence of that incapability under this particular provision of Article 120, UCMJ.

The definitions section of the statute also leads to that conclusion. The statute outlined certain circumstances in which a person legally cannot consent to sexual activity. As the military judge instructed the panel, Article 120(t)(14), UCMJ provided "[a] person cannot consent to sexual activity if . . . substantially incapable of . . . physically declining participation in the sexual conduct at issue . . . ." *MCM*, A28-4–A28-5 (2012 ed.). One could conceive of lawful conduct between adults in which one person is voluntarily restrained in such a way that he is not physically capable of *resisting* a sexual act, but nonetheless has the capability and the legal capacity to *consent* to that act. While there may be exceptional cases that test the statutory definition, this case is not one of them.

Even if we assumed the facts to be as A1C CH testified, as a legal matter, she would not have lost the capability to consent. She testified that one airman had his arm across her chest, preventing her from getting up, while the appellant was on top of her legs. If, under those circumstances, she freely assented to a sexual act and communicated that assent to the appellant, then the sexual act would have been lawful, notwithstanding the physical restraint she was experiencing. That can only be true if the "capability" at issue is the ability to mentally form and verbally communicate one's declination to participate, rather than the capability to physically resist the act itself.

While neither the parties nor the court discovered case law precisely on point, courts have reached similar results in cases addressing substantial incapacity to decline participation in sexual activity. In *United States v. Johanson*, the Coast Guard Court of Criminal Appeals considered the issue in the context of an abusive sexual contact charge.[8] *See United States v. Johanson*, 71 M.J. 688 (C.G.C.C.A. 2012). The *Johanson*

---

[8] Abusive sexual contact, under Article 120(h), UCMJ in effect at the time, included sexual contact—as opposed to a sexual act—when the alleged victim was substantially incapable of declining participation in the contact. *See MCM*, A28-2 (2012 ed.).

court, after analyzing the legislative history of the 2006 changes to Article 120, UCMJ,[9] found the charge of abusive sexual contact legally insufficient when "evidence clearly show[ed] that [the victim's] mental state was not substantially impaired."[10] *Id*. at 693. In *United States v. Williams*, 89 F.3d 165 (4th Cir. S.C. 1996), the United States Court of Appeals for the Fourth Circuit considered an analogous provision of 18 U.S.C. § 2242(2)(B).[11] . In *Williams*, the victim woke up to find her assailant in her room. *Id*. at 168. After Williams tried to pull her underpants off, she pulled them back on. *Id*. When Williams forced her legs open, the victim resisted. *Id*. The court held:

> The evidence negates the possibility that [the victim] was 'physically incapable of declining participation in, or communicating unwillingness to engage in' a sexual act with Williams. The fact that she was unsuccessful in fending off Williams does not mean that she was physically incapable of expressing her desire not to participate in sexual activity with him.

*Id.*

We now turn to the evidence in this case. While the government proved that A1C CH was being held down by A1C TN, they never contended that she lacked the capability to refuse to participate. To the contrary, the government elicited testimony that she did in fact refuse, by saying "no" repeatedly, but the appellant disregarded her refusal. Although A1C CH had been drinking, she testified that she remained in control of her faculties. She also testified that she did not consent to the appellant engaging in a sexual act with her, and that she told him "no" several times, beginning when he got on top of her and continuing during the sexual act. While the trial defense counsel contested her testimony, the defense focus was on eliciting evidence to show that she was a willing participant in the sexual act, and that evidence demonstrates that she was capable of declining participation. The evidence also included the appellant's interview with agents from the Air Force Office of Special Investigations (AFOSI), where the appellant asserted A1C CH was a willing participant, to the point of guiding his penis to achieve penetration.

---

[9] The revisions to Article 120, UCMJ at issue were contained in the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 552, 119 Stat. 3136 (2006).

[10] We need not reach the *Johanson* court's broader holding that only mental impairment could meet the requirement of substantial incapacity to decline participation since the evidence in this case indicates the alleged victim did decline participation. We leave that determination to a case in which it is squarely presented.

[11] 18 U.S.C. § 2242(2)(B) was part of the Sexual Abuse Act of 1986, upon which the 2006 changes to Article 120, UCMJ were generally based. *See MCM*, A28-17 (2012 ed.). It provides, in relevant part, "[Anyone who] engages in a sexual act with another person if that other person is . . . physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act . . . shall be fined under this title and imprisoned for any term of years or for life."

While the testimony raises a material dispute as to whether A1C CH did, in fact, consent, it raises no evidence that she was physically or mentally incapable of declining participation in the act. The government asserted that she did decline, and the appellant asserted that she affirmatively did not. On those facts, even in the light most favorable to the government, we must find that a reasonable fact finder properly instructed on the definition of "substantially incapable of declining participation" could not have found that the evidence established the second element of the offense beyond a reasonable doubt.[12] We also conclude, after making allowances for not personally observing the witnesses, the evidence was factually insufficient to establish the second element of the offense.

We considered whether we could affirm a conviction under the alternative theory of aggravated sexual assault by causing bodily harm. Article 120(c)(1)(B), UCMJ. "The term 'bodily harm' means any offensive touching of another, however slight." Article 120(t)(8), UCMJ. However, we are precluded from affirming to this alternative theory. "Clearly, an accused cannot be convicted of a crime different from that charged." *United States v. Wray*, 17 M.J. 375, 376 (C.M.A. 1984). The Supreme Court has clearly stated that an appellate court may not affirm a conviction on a theory not presented at trial. "To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused." *Dunn v. United States*, 442 U.S. 100, 106 (U.S. 1979). Our superior court has also clearly stated that we may not affirm a conviction on theory not presented at the court-martial to the trier of fact. *United States v. Riley*, 50 M.J. 410 (C.A.A.F. 1999). Because the government chose not to prefer a specification of aggravated sexual assault by bodily harm, we are foreclosed from affirming under this materially alternative theory upon appellate review.

Despite determining the evidence was legally and factually insufficient to sustain the charged offense, we may nonetheless affirm so much of the finding that includes a lesser included offense (LIO). *See* Article 59(b), UCMJ, 10 U.S.C. § 859(b). At trial, neither the government nor trial defense counsel requested instructions on any potential LIOs. However, we are not precluded from considering LIOs not instructed upon below but necessarily included in the theory of liability presented at trial. "[A]n appellate court may disapprove a finding because proof of an essential element is lacking or, as a result of instructional errors concerning lesser-included offenses, may substitute a lesser-included offense for the disapproved findings. This is true even if the lesser-included offense was neither considered nor instructed upon at the trial of the case." *United States*

---

[12] As discussed below, we find that the military judge deviated from the standard *Benchbook* definitions in this respect, but for reasons of judicial economy decide this issue on the basis of legal and factual sufficiency alone.

*v. Upham*, 66 M.J. 83, 87–88 (C.A.A.F. 2008); *but see United States v. McCracken*, 67 M.J. 467, 468 (C.A.A.F. 2009) (an appellate court may not affirm an included offense on a theory not presented to the trier of fact).

We review de novo whether an offense constitutes an LIO. *United States v. Girouard*, 70 M.J. 5, 9 (C.A.A.F. 2011). We apply the elements test to determine whether an offense is an LIO of another. *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010) (citation omitted). The elements need not reflect identical statutory language. *United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010). "Rather, after applying normal rules of statutory interpretation and construction, [the court] will determine whether the elements of the LIO would necessarily be proven by proving the elements of the greater offense." *United States v. Wilkins*, 71 M.J. 410, 412 (C.A.A.F. 2012). Moreover, the two offenses under consideration must not constitute alternative bases for criminalizing the same conduct. The greater offense must require the proof of some additional fact that the members would need to find in order to convict. *See United States v. Tunstall*, 72 M.J. 191, 195 (C.A.A.F. 2013).

Although not conclusive, the *Manual* lists two LIOs that may be applicable in these circumstances: wrongful sexual contact under Article 120(m), UCMJ, and assault consummated by a battery under Article 128, UCMJ.[13] *See MCM*, Part IV, ¶ 45.e.(3). Since the gravamen of the offense is most closely related to wrongful sexual contact, we analyze that LIO next.

Wrongful sexual contact, as a potential LIO on these facts, has three elements: 1) that at or near San Antonio, Texas, on or about 12 November 2011, the accused engaged in sexual contact, to wit: touching the genitals of A1C CH, with A1C CH; 2) that such sexual contact was without the permission of A1C CH; and 3) that such sexual contact was wrongful. *See Benchbook* at ¶ 3-45-11.c. Although permission is not defined in the statute or the *Manual*, the *Benchbook* provides "'[w]ithout permission' means without consent." *Id.* at ¶ 3-45-11.d. The *Benchbook* further defines consent consistent with that portion of Art. 120(t)(14), UCMJ that provides a person cannot consent if substantially incapable of physically declining participation in the activity. *Id.* As none of the elements employ identical language, we proceed to consider whether, in the course of

---

[13] Abusive sexual contact is generally an LIO of aggravated sexual assault. However, under the theory of culpability selected by the government, that offense would still require proof that that A1C CH was substantially incapable of declining participation in the sexual contact. Although abusive sexual contact could be charged under the theory that the appellant engaged in sexual contact with A1C CH by bodily harm, that theory was not presented to the members at trial and we cannot affirm a conviction to an LIO on a theory not presented at trial. *See United States v. McCracken*, 67 M.J. 467, 468 (C.A.A.F. 2009).

proving the elements of aggravated sexual assault, the government would necessarily have proven the elements of wrongful sexual contact.

Two of the elements need little additional analysis. By proving the act of penetration, the government would necessarily have proven a touching of A1C CH's genitals. Accordingly the first element of wrongful sexual contact is included within the first element of aggravated sexual assault. Similarly, since there is no evidence of a lawful medical or military purpose for the appellant's touching of A1C CH's genitals, the only authorization which would negate the element of wrongfulness would be if A1C CH herself authorized the contact. Wrongfulness, therefore, would necessarily have been proven if the government proved she lacked the capacity to grant such consent.

To complete the analysis, we must determine whether the lack of permission is included in, but not completely encompassed by proof of substantial incapability to decline participation. As our analysis above indicates, the government would have needed to prove more than lack of permission to prove incapability—indeed, that was the deficiency in this case. The question is whether lack of permission is necessarily established by proof of incapability. Looking only at the facts needed to prove each assertion, they appear to be completely independent. Proof of incapability need not show any speech, gesture or other manifestation of assent. In fact, it is commonly proved by the absence of such things when they would normally be expected. Similarly, proof that the alleged victim affirmatively withheld permission—as in this case—usually negates the lack of capability. However, the proper analysis is not based on whether the evidence is the same, but rather whether the greater element necessarily proves the lesser.

In this case, the greater element is that A1C CH was substantially incapable of declining participation. The element establishes the offense because, as a matter of law, she cannot consent if she is substantially incapable of declining participation. In other words, proof of incapability is always proof of lack of permission because the alleged victim legally cannot grant permission. If incapability is proven, permission is legally impossible despite any conduct by the victim to the contrary. The greater/lesser character of the elements is established not by any factual relationship, but rather by the legal relationship. Because that legal relationship exists, proof of incapability does necessarily prove lack of permission and the second element of wrongful sexual contact is included within the second element of aggravated sexual assault as charged in this case.

We find that the evidence was factually and legally sufficient to sustain a conviction for the LIO of wrongful sexual contact. After making allowances for not

having personally observed the witnesses, we find that A1C CH's testimony that she told the appellant "no" was more credible than the testimony of the other airmen in the room, and more convincing than the version of events asserted by the appellant in his interview with AFOSI. As the evidence that the appellant touched A1C CH's genitals is uncontroverted, we conclude that the evidence establishes all three elements of wrongful sexual contact beyond a reasonable doubt.

*Instructional Error*

The findings instructions given by the military judge deviated from the *Benchbook* on the aggravated sexual assault charge without explanation on the record. The instructions omitted any version of the second definition in *Benchbook* ¶ 3-45-5.d., which defined substantial incapacity, a key term in the second element which is not within the normal understanding of most members. Although neither party objected to the omission, we still review the omission for plain error. *See United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013); R.C.M. 920(f).[14] In light of our analysis of the legal and factual sufficiency of the aggravated sexual assault charge, we conclude that the issue of instructional error is moot.

*Improper Argument*

The appellant also asserts, pursuant to *Grostefon*, 12 M.J. at 431, that the military judge erred "when she allowed the prosecution to use propensity evidence of a recording introduced for charges unrelated to appellant's Article 120 offenses during government counsel's argument."

The evidence in question was part of an audio recording that was the subject of pretrial motions as to its admissibility. The recording, from a smartphone chat application called Voxer, included the appellant using the term "guaranteed ass" to refer to some women he had attempted to bring onto Aviano AB. The recording was admitted for the purpose of showing the appellant's motive relevant to the disorderly conduct charge, but the military judge gave the following limiting instruction just prior to closing argument:

---

[14] Although we recognize the rule describes this as "waiver," this is in fact forfeiture. *See United States v. Sousa*, 72 M.J. 643, 651 (A.F. Ct. Crim. App. 2013).

[The recording] is not part of any offense with which Airman Jones is charged. The Voxer recording may be considered for the limited purpose of its tendency, if any, to show a motive for Airman First Class Jones to return to the front gate on 15 September 2012.

You may not consider this evidence for any other purpose and you may not conclude or infer from this evidence that the accused is a bad person or has general criminal tendencies, and that he therefore committed the charged offenses.

During closing argument, government trial counsel emphasized the appellant's phrase "guaranteed ass." Despite the military judge's instruction, government counsel opened his argument by playing the recording, and then argued to the members:

Guaranteed ass. "We had guaranteed ass. We had guaranteed ass on this base and [Airman C] and Italian gate guards got in the way." Now, he's not charged for this Voxer recording itself, but this Voxer recording gives you an insight into the mindset of Airman Jones. This is who Airman Jones is.

This argument was clearly improper. However, the mere existence of improper argument does not automatically merit relief.

Trial defense counsel did not initially object to this line of argument. Only when government counsel stated that appellant believed the women at Aviano AB who got in his car were "guaranteed ass," did trial defense counsel object. The basis for that objection was that there was no allegation of assault concerning those women. Government counsel responded that he was not talking about any offense related to those women, but about the term generally. The military judge ruled that his reference was a fair comment on the evidence. Although the military judge did not explain her ruling on the record, we note that her limiting instruction allowed the use of that specific reference, at least in so much as it related to the appellant's motive to come back to the gate. Government counsel continued to use the term throughout closing argument without further objection.

Failure to object to improper argument before the military judge begins to instruct the members on findings constitutes waiver of the objection.[15]  *See* R.C.M. 919. We review such arguments for plain error.  *See United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013).  Under the plain error analysis, the appellant has the burden of demonstrating prejudice.  *Id.*  In the context of improper argument, we test for prejudice by balancing three factors:  the severity of the improper argument, the measures adopted to cure the improper argument, and the weight of the evidence supporting the conviction. *See id*. at 480.

In this case, our *Halpin* analysis is somewhat complicated by our determination that the finding of guilt to the aggravated sexual assault offense was legally insufficient. It is possible that this specification survived the trial to be before us on review only because of the improper argument by counsel.  However, our favorable review of his legal sufficiency claim on the basis of the government's charging decision should not result in a windfall for the appellant on this separate issue.  We determined above that a properly instructed panel would have found the appellant guilty of the LIO of wrongful sexual conduct.  Since the members convicted the appellant of the larger offense, it stands to reason that they would have convicted on the LIO, and we would have that specification before us on review.  The improper argument was only prejudicial to the extent it would have caused the members to convict him of *that offense* based upon something other than the weight of the evidence alone.  Accordingly, we conclude that our *Halpin* analysis should focus on the prejudice the improper argument would have created in a determination of guilt to the legally sufficient LIO of wrongful sexual contact.

We find that the appellant has not shown that he was prejudiced by the improper argument.  In this case, the government counsel's improper use of the appellant's words was pervasive, but constituted more of a punchline than an earnest suggestion of an actual willingness to disregard the law.  We also recognize that the phrase was already properly before the members in the appellant's own voice.  In that respect, this is unlike argument that improperly compares the appellant to some historical or literary villain or invokes evidence that was ruled completely inadmissible.  Moreover, government counsel's improper argument was ameliorated by the military judge's limiting instruction on this specific matter given just prior to argument.  Her instruction told them they must disregard any suggestion that the recording indicated the appellant was a bad person or had general criminal tendencies.  We presume the members followed that instruction. *See United States v. Stewart*, 71 M.J. 38, 43 (C.A.A.F. 2012).  Unlike counsel's argument, that instruction was available to the members during deliberation.

---

[15] As noted in reference to R.C.M. 920 above, we construe the R.C.M. 919 reference to waiver as forfeiture. *See Sousa*, 72 M.J. at 651.

Finally, the weight of the evidence to sustain the conviction to the LIO of wrongful sexual contact is substantial. A1C CH's testimony that she said "no" was convincing, supported by other testimony, and consistent with independent evidence of her post-assault conduct. On balance, we are confident that the appellant's conviction for wrongful sexual contact rests upon the weight of the evidence alone, and not on the basis of the improper tag line used by government counsel. The appellant has therefore failed to meet his burden of showing prejudice, and this issue is without merit.

*Sentence Reassessment*

Having set aside a finding of guilty to one of the specifications, we must now "determine what sentence the court-martial would probably have adjudged if the error had not been committed at trial." *United States v. Davis*, 48 M.J. 494, 495 (C.A.A.F. 1998). This court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has held that a Court of Criminal Appeals can reassess a sentence to cure the effect of prejudicial error where that court can be confident "that, absent any error, the sentence adjudged would have been of at least a certain severity." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

In determining whether to reassess a sentence or order a rehearing, we consider the totality of the circumstances with the following as illustrative factors: (1) dramatic changes in the penalty landscape and exposure, (2) the forum, (3) whether the remaining offenses capture the gravamen of the criminal conduct, (4) whether significant or aggravating circumstances remain admissible and relevant, and (5) whether the remaining offenses are the type with which we as appellate judges have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16. Because there are factors on both sides in this case, we set out our rationale in some detail below.

The penalty landscape is significantly different as a result of the aggravated sexual assault specification being set aside. The appellant originally faced confinement for 32 years and 6 months. In arriving at this maximum, the military judge merged some of the specifications for sentencing, including the aggravated sexual assault and indecent conduct specifications (which the government requested "because the same conduct is charged in both specifications"). These offenses carried a maximum sentence to confinement of 30 years and 5 years, respectively. We have now set aside the aggravated sexual assault specification and substituted a wrongful sexual contact specification,

which carries a maximum sentence of 1 year confinement and a dishonorable discharge. Based on the merging decision requested by the trial counsel, the 5 year maximum for the original specification of indecent conduct is now used to calculate the new maximum sentence—7 years and six months confinement, along with a dishonorable discharge.

Despite the substantial drop in the maximum punishment, the adjudged sentence of three years confinement is still less than one-half of the revised maximum. Government counsel argued for a sentence including 8 to 10 years of confinement, which is above the revised maximum. Furthermore, it is only one component of a punishment that also included dishonorable discharge, forfeiture of all pay and allowances, and reduction to E-1.

The appellant chose to be sentenced by members, which generally weighs in favor of remanding a case for a rehearing on sentence. Our superior court has observed that "judges of the courts of criminal appeals are more likely to be certain of what a military judge would have done as opposed to members." *Winckelmann*, 73 M.J. at 16.

The factor that weighs most strongly in favor of reassessment is the highly similar nature of the offense that has been set aside and the LIO that remains. All of the same conduct would have been before the members on either charge, and they would have heard all of the same evidence. Although aggravated sexual assault in the abstract is more serious, the factual core of this offense—engaging in sexual intercourse with A1C CH without her consent—remains the same. We conclude, based on our experience, that members derive sentences based on the conduct shown by the evidence, not the legal label courts attach to that conduct. *See Davis*, 48 M.J. at 495–96. We also note that the unremitting nature of the appellant's misconduct would have remained before the court. Whether his conduct at technical school legally constituted sexual assault or wrongful sexual contact, the fact remains that for the majority of his short career, he was unable to conform his conduct to the requirements of the UCMJ.

Finally, we conclude that the type of offenses of which the appellant remains convicted are those with which we are experienced and familiar. The appellant's drunken and undisciplined conduct while overseas and the sexual misconduct he committed while in technical school are regrettably not infrequent offenses in military courts. Our combined experience provides a substantial basis to judge how members tend to treat such offenses individually and when they appear as a more substantial pattern of misconduct.

Under the totality of the circumstances, we are confident that we can reliably determine that the members would have imposed no less than the same sentence whether the appellant was convicted of aggravated sexual assault or wrongful sexual contact. Our finding did not involve the exclusion of evidence resulting in an entire offense being removed from the members' purview or a reduction to a less culpable state of mind. It involved the legal interpretation of the specification the government elected to pursue. The evidence of the appellant's culpability and the harm inflicted on A1C CH would have remained exactly the same. Convinced, as we are, that members sentence based on the underlying conduct and not the name of the offense, we conclude that sentence reassessment is appropriate in this case. We reassess the sentence to be the same as the sentence adjudged.

*Conclusion*

The finding of guilty of Specification 1 of Charge IV,[16] alleging aggravated sexual assault of CH, is set aside, substituting therefor a finding of guilty to the lesser included offense of wrongful sexual contact. All other findings are affirmed.

The findings, as modified, and the sentence, as reassessed, are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). They are accordingly, **AFFIRMED**.

HECKER, Senior Judge (concurring in part and dissenting in part):

I concur with the majority's decision with the exception of its conclusion that sentence reassessment is appropriate. Unlike my brethren, I am not confident that, absent this error, the sentence adjudged would have been at least a certain severity, given the significant change in the penalty landscape, the sentencing argument made by the trial counsel, and the uncertainty of what the panel members would have done in sentencing if they had been properly instructed on the aggravated sexual assault offense.

---

[16] This opinion refers to the numbering of Specifications and Charges as they were numbered on the original charge sheet.

Accordingly, I would return the case to the convening authority for a sentence rehearing.



FOR THE COURT

STEVEN LUCAS
Clerk of the Court

ACM 38434